STUART SEABORN (CA BAR NO. 198590)
MONICA PORTER (CA BAR NO. 311974)
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, California  94704-1204
Telephone:      (510) 665-8644
Facsimile:       (510) 665-8511
sseaborn@dralegal.org
mporter@dralegal.org

MAIA GOODELL (*Pro Hac Vice* Admission Pending)
Disability Rights Advocates
655 Third Avenue, 14th Floor
New York, New York 10017
Telephone:      (212) 644-8644
mgoodell@dralegal.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mental Health & Wellness Coalition, Erik X., Tina Y., Jacob Z. | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| Plaintiffs, | **CLASS ACTION** |
| v. | |
| Stanford University and The Board of Trustees of the Leland Stanford Junior University, | |
| Defendants. | |

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## INTRODUCTION

1.     This class-action lawsuit seeks to put an end to Stanford University's punitive, illegal, and discriminatory treatment of students with mental health disabilities.

2.     Despite being a highly selective university regularly ranked in the top five nationally and globally and charging tuition in the range of $50,000 per year, Stanford maintains antiquated policies, practices, and procedures related to mental health that violate anti-discrimination laws.

3.     This is especially troubling in light of the surging numbers of college students reporting declining mental health as they struggle with challenges such as being away from home for the first time and pressures related to drugs, alcohol, and dating; all while juggling the rigorous demands of academics, especially at an elite institution such as Stanford.

4.     Recent studies of college students indicate record numbers of students dealing with depression, anxiety, eating disorders, and other mental health disabilities.

5.     The National Council on Disability, for example, recently found that thirty-five percent of students met the criteria for at least one mental health disorder, and twenty percent of students have considered suicide at some point during their college career.

6.     Suicide is the second leading cause of death among college students.

7.     Ninety percent of those who die by suicide had a diagnosable mental health disorder at the time of their death.

8.     Students who receive mental health support are more likely to stay in school and to graduate.

9.     Yet, only half of college students experiencing a mental health crisis seek help, largely due to the justified fear of stigma and negative consequences.

10.     Too often, universities respond to disability-related behavior with exclusion, blame, and draconian measures such as forced leave.

11.     Stanford is a particularly egregious example. Stanford has a blanket practice of immediately ejecting students from its programs and housing when students engage, or are perceived to be at risk of engaging in, disability-related behaviors such as self-harm.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

12.    Stanford has a practice of pressuring students, immediately after reports of crisis behavior, into taking leaves of absence; requiring immediate withdrawal from all classes, programs, and housing, without an individualized evaluation of reasonable accommodations.

13.    Further perpetuating mental health stigma and additional harm, Stanford requires students wishing to return to the University to write statements accepting blame for their disability related behavior and to submit to invasive examination of their medical records and evaluations by university doctors who second-guess the students' treating doctors.  Stanford also mandates costly and time-consuming treatment plans in addition to those recommended by the students' doctors.

14.    Stanford's policies, practices, and procedures amount to illegal disability discrimination and must be ceased immediately.

## JURISDICTION AND VENUE

15.    This is an action for declaratory and injunctive relief, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, *et seq.*; the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; the Unruh Civil Rights Act, Cal. Civ. Code § 51, *et seq.*; California Government Code § 11135; and the California Fair Employment and Housing Act, Cal. Gov. Code § 12900, *et seq.*

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for Plaintiffs' claims arising under the ADA, Section 504, and the Fair Housing Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for claims arising under the Unruh Civil Rights Act, California Government Code § 11135, and the California Fair Employment and Housing Act.

17.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b), because: (1) Stanford and its real property are located in the District, and (2) a substantial part of the events or omissions giving rise to the claims occurred within the District.

18.     Pursuant to the Northern District of California Civil Local Rules 3-2(c), (e), because this action arises in Santa Clara County, this action should be assigned to the San Jose Division.

**PARTIES**

19.     Plaintiff Jacob Z.[1] is a twenty-year-old Stanford student who resides in Palo Alto, California during the academic year and is currently residing in San Jose, California as he is currently on an imposed leave of absence. He is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While he was a student at Stanford and participating in residential mental health treatment, Stanford discriminated against Jacob Z. on the basis of disability by barring him from the campus community and imposing onerous requirements for him to return.

20.     Plaintiff Tina Y. is a twenty-three-year-old Stanford student who resides in Palo Alto, California during the academic year. She is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While participating in Stanford's overseas studies program, Tina Y. was hospitalized for mental health treatment. Stanford subsequently discriminated against Tina Y. on the basis of disability by barring her from the overseas studies program and imposing onerous requirements for her to return.

21.     Plaintiff Erik X. is a twenty-three-year-old Stanford student who resides in Palo Alto, California during the academic year. Erik X. is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While he was a student at Stanford and in the hospital for mental health treatment, Stanford discriminated against Erik X. on the basis of disability by barring him from the campus community and imposing onerous requirements for him to return.

---

[1] Individual Plaintiffs are identified with pseudonyms.  Plaintiffs will file a motion to proceed under fictitious names and to seal the reference list giving corresponding true names, pursuant to Federal Rule of Civil Procedure 5.2.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

22.     Plaintiff Mental Health & Wellness Coalition ("the Coalition") is a membership organization made up of more than twenty student groups focused on raising awareness and advocating for administrative changes pertaining to student mental health and wellness. The Coalition has been directly injured by Stanford's leave of absence policies through frustration of its mission to promote student mental health and wellness, and through diversion of its resources. The Coalition has developed and presented trainings to Stanford staff on how to support students who are hospitalized for mental health treatment and subsequently placed on a leave of absence. Additionally the Coalition has members who have been directly harmed by Stanford's leave of absence policies by being placed on a leave of absence themselves, or deterred from utilizing campus counseling services because of Stanford's leave of absence policies.

23.     Stanford University is a private university located in Stanford, California. As a place of education, Stanford qualifies as a "place of public accommodation" under Title III of the ADA as that term is defined under 42 U.S.C. § 12181(7)(J). Stanford is also a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act and a recipient of state financial assistance within the meaning of California Government Code § 11135.

24.     The Board of Trustees of the Leland Stanford Junior University is custodian of the endowment and all the properties of Stanford University. The Board administers the invested funds, sets the annual budget, and determines policies for operation and control of the University. The Board delegates broad operational authority to the president of the University.

25.     Throughout this complaint, Plaintiffs refer to Defendants collectively as "Stanford" or "University."

## FACTUAL ALLEGATIONS

26.     Stanford is a highly selective elite university; ranking fifth among national universities and third in global rankings, Stanford admits fewer than five percent of applicants and enrolls fewer than four percent of applicants.

27.     Stanford's student body, like those at other higher education institutions, is experiencing high rates of mental health disabilities.

28.    Stanford's policies, practices, and procedures have and continue to discriminate against students with mental health disabilities by denying them full and equal access to the benefits of Stanford's programs, facilities, and services.

29.    In the 2016–17 academic year, Stanford had 16,336 enrolled students; including 7,032 undergraduates.

30.    Approximately ninety-seven percent of all Stanford undergraduates live in campus housing, which costs around $15,000 per year.

31.    Undergraduate tuition at Stanford is around $50,000 per year.

32.    Also on campus is Stanford Hospital, including an emergency room and inpatient psychiatric facilities, where most students requiring emergency mental health treatment receive such services.

# I.    STANFORD'S LEAVE OF ABSENCE POLICY DISCRIMINATES AGAINST AND EXCLUDES STUDENTS WITH MENTAL HEALTH DISABILITIES

33.    Stanford's leave of absence policy allows the University to impose a leave if it determines, *inter alia*, that the student "presents a substantial risk of harm" to themselves, is "unable or unwilling" to care for themselves, requires a "level of care" in excess of that which the University could provide, or otherwise "disrupts" the University community.

34.    In practice, Stanford applies this policy on a blanket basis to exclude students with mental health disabilities who are hospitalized.

35.    Stanford's practice of responding to students in crisis is to immediately bar them from the University community, prohibit them from being present on campus, and evict them from their housing.

36.    Stanford fails to conduct individualized assessments prior to banning and evicting to consider whether Stanford could provide reasonable accommodations to enable the student to remain on campus, the student will have adequate supports while on leave, or whether Stanford's actions will further endanger the at-risk student.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

37.     Stanford imposes leaves of absence on students with mental health disabilities who resist coercive efforts to go on leave voluntarily, and systematically discourages students from appealing mandated leaves.

38.     Stanford does not even allow students who are placed on a leave of absence while still in the hospital receiving mental health treatment to return to their dormitories to collect their belongings.

39.     Adding insult to injury, Stanford charges students hundreds of dollars in various administrative fees and costs related to their involuntary dismissal; such as for changing their academic schedule and terminating their housing contract.

40.     Stanford also imposes onerous requirements on students who wish to return to the university; such as signing a release of medical information to permit Stanford to speak directly with private healthcare providers, committing to costly and time-intensive treatment plans other than those prescribed by their healthcare providers, and submitting a personal statement in which the student accepts blame for their disability-related behaviors, all without acknowledging any rights or protections on the basis of the disability or considering appropriate disability-based accommodations.

## II.     STANFORD'S LEAVE OF ABSENCE POLICY HAS HARMED PLAINTIFF JACOB Z.

41.     Plaintiff Jacob Z. was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory policies and procedures related to mental health.

42.     Jacob is a twenty year-old Stanford student who resides in Palo Alto, California during the academic year.

43.     Jacob enrolled at Stanford in Fall 2016. A leader and contributor to several student organizations at Stanford, Jacob maintained a 4.0 grade point average.

44.     Jacob is currently on a leave of absence and residing in San Jose, California.

45.     In early January 2018, during the second week of Winter Quarter, Jacob experienced suicidal ideation. He consulted with his psychiatrist at Stanford's Counseling and

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Psychological Services ("CAPS") and, pursuant to their instruction, asked a friend to hold onto his Tylenol.

46.     On February 20, 2018, while adjusting to a new prescribed medication as part of his mental health treatment, Jacob experienced suicidal ideation while in his dorm room. As planned in advance with his therapist in such an instance, Jacob reached out to a friend for help.

47.     While on the phone with a friend, Jacob's roommate returned to their room and Jacob opened the door to let him in. Jacob then spoke with his roommate, another friend, and his Residence Advisor, and he walked with them to the Vaden Health Center to speak with a treatment provider. In speaking with treatment providers about options, Jacob agreed to an involuntary psychiatric hold at Stanford Hospital, and was escorted to the hospital for mental health treatment.

48.     On February 23, while Jacob was still in the hospital, John Giammalva, a Residence Dean, visited Jacob and told him that he had caused his dormmates psychological harm, and that they were talking about him.  Giammalva said that Jacob had been a disruption to the community and it was unfair for Jacob to impose a burden on other students and staff. Giammalva also referred to Stanford's residence agreement, made Jacob feel he had violated the rules, and threatened Jacob with legal action and a ban from his dormitory.

49.     Jacob felt traumatized by this conversation and requested that hospital staff be present for any future conversations with Giammalva.

50.     After this conversation, Jacob felt like he no longer had a support system at Stanford, and did not reach out to friends at Stanford because he feared being penalized. When Jacob was reunited with his friends, they assured him that Giammalva's statements about the impact he had had on them were not true.

51.     On February 26, while Jacob was still in the hospital, he met with Leigh Thiedeman, another Residence Dean, who told him that he would be placed on a housing hold and a Dean's Leave of Absence.

52.     On February 28, Jacob was discharged directly to La Selva Mental Health Services for residential treatment.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

53.     On March 5, while Jacob was engaged in treatment at La Selva, he received a letter from Giammalva notifying him that Stanford had revoked his on-campus housing and he was "prohibited from setting foot in all Stanford residential areas (including residences and dining halls)." The housing hold letter cited language from the Dean's Leave of Absence policy; noting that the revocation was due to his "inability to care for [his] personal safety" and "unreasonable level of care required from friends and staff."

54.     The letter further cited to Stanford's Residence Agreement and Fundamental Standards of Conduct and chastised Jacob for violating those standards by failing to "be considerate of other residents and staff," "respect the rights of others," and show "respect for order, morality, [and] personal honor." The letter mentioned nothing about Jacob's behavior being connected to or the result of a disability, nor any possible disability-based accommodations.

55.     Stanford also initially charged Jacob's account a $450 housing administrative fee to process the contract termination.

56.     Jacob reached out to Residence Dean Thiedeman to seek clarification as to the reasons for his housing hold and received vague responses. She admitted she had not spoken with his friends but claimed that unidentified other people had, and had determined there was an impact on his friends. Thiedeman's insistence that Jacob likely harmed his friends interfered with his recovery.

57.     On March 6, Jacob received a letter from Chris Griffith, Associate Vice Provost and Dean of Students, regarding the leave of absence. The letter purported to outline concerns regarding Jacob asking his peers for help in addition to working with his treatment team at CAPS. At the same time as it chastised him for seeking support outside of formal university channels, the letter claimed that Jacob's "situation required a level of support from University staff and students that was unsustainable and for which they did not have the professional expertise to manage."

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    58.    Jacob's friends assured him that they had not been contacted by Stanford's

2    administration. Jacob's roommate even sent a letter to Griffith to clarify the events leading to

3    Jacob's hospitalization and request that she reconsider her decision.

4    59.    At no point did anyone from Stanford discuss any accommodations or speak with

5    Jacob about options other than a leave of absence.

6    60.    Jacob was left to look into options and coordinate administrative processes with

7    faculty and staff on his own; including completing Winter Quarter coursework for two courses,

8    petitioning for a late withdrawal from one course; and looking into registering with the Office for

9    Accessible Education, taking courses online, and returning to campus part-time.

10    61.    On March 28, with the support of his care team at La Selva, Jacob submitted an

11    appeal to the leave of absence decision. In it, he explained the progress he had made in treatment,

12    his belief that returning to his hometown in Utah could be more harmful to his mental health, and

13    his request to return with a reduced course load while simultaneously continuing mental health

14    treatment.

15    62.    That same day, Jacob's psychiatrist submitted a corresponding letter of support

16    outlining Jacob's progress with treatment and stating that "[i]t is my opinion that Jacob would

17    benefit from returning to Stanford for spring quarter in 2018 with a reduced course load."

18    63.    The next day, March 29, Jacob appeared before a panel of three administrators

19    over Skype. The next week, Jacob learned that the appeal committee and Dean of Students had

20    denied his appeal and had recommended a leave to Griffith, who  placed Jacob on a mandatory

21    leave of absence on April 5.

22    64.    In order to return from his current, forced leave of absence and to residential

23    housing, Stanford is requiring Jacob to provide documentation of mental health treatment to

24    show that he has "addressed the issues that led to [his] loss of housing privileges," sign a release

25    of medical information to permit Stanford to speak directly with private healthcare providers,

26    submit a personal statement describing his "understanding of why [his] behaviors are of

27    concern," and meet periodically with a Residence Dean. These requirements make no mention of

28

---

*Mental Health & Wellness Coalition, et al v. Stanford University*, **Case No.:**
**COMPLAINT**                                                                          9

Jacob's behaviors being connected to or the result of a disability. Nor do they include any discussion or consideration of possible reasonable accommodations.

65.     Throughout this process, Stanford has treated Jacob more as a legal liability than as a student. Stanford has aggravated Jacob's stress with vague, incomplete information and complicated processes which he must navigate without assistance or explanation. Rather than being the supportive community Jacob and his parents were assured Stanford would be when he decided to enroll, Stanford has disregarded the recommendations of Jacob's treatment providers, barred Jacob from campus and his housing, made him to feel as though he has violated the rules by having a mental health disability, and, in order to return to campus and housing, ordered him to apologize for it.

## III.     STANFORD'S LEAVE OF ABSENCE POLICY HAS HARMED PLAINTIFF TINA Y.

66.     Plaintiff Tina Y. was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory policies and procedures related to mental health.

67.     Tina is a twenty-three year-old Stanford student who resides in Palo Alto, California during the academic year and has been a leader in several student organizations, including student government, in her time at Stanford.

68.     In Fall 2013, during her first quarter at Stanford, Tina was diagnosed with post-traumatic stress disorder ("PTSD") after being sexually assaulted by another student. That spring, Justin Neiman, a Residence Dean, asked her to avoid being seen by or interacting with admitted students during Admit Weekend, and warned that she may be forced to take a leave of absence if she was perceived to be too much of a liability.

69.     The following Fall 2014 quarter, Tina took a voluntary leave of absence to focus on her health, and returned to Stanford for the Spring 2015 quarter. After completing a summer internship in New York, she returned to Stanford for the Fall 2015 quarter and co-founded a campus group to improve student mental health.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

70.     In Winter 2016, Tina suffered a concussion which exacerbated her mental health symptoms. In Spring 2016, she reached out to her psychiatrist and, in consultation with her, agreed to seek treatment at the hospital. After the hospitalization, Tina took a voluntary leave of absence to focus on treatment and ensure she was at her best before studying abroad. In consulting with Stanford counselors and administrators, they assured Tina that her leave of absence would not negatively impact her ability to study abroad, because she had been proactive in investing in her mental health.

71.     During the summer of 2016, Tina participated in Stanford's overseas studies program in Cape Town, South Africa.

72.     In July of that summer, Tina experienced a PTSD episode and subsequently engaged in non-suicidal self-harm and reached out to her Resident Assistant for help.

73.     Two days later, on July 29, Trudy Meehan, the Director for Stanford's Cape Town Overseas Studies Program, took Tina to an emergency room to seek a medication adjustment to treat her anxiety symptoms. At the hospital staff's recommendation, they went to the Akeso Psychiatric Clinic to see an on-call psychiatrist. After Tina spoke with the on-call doctor, Meehan spoke with the doctor, separately.

74.     Tina did not want to remain at the clinic. Clinic staff initially told her that she could leave. An hour later, Meehan, the Stanford Director, told Tina that she had to spend the night in the hospital or else be removed from Stanford's program.

75.     The next day, July 30, Meehan informed Tina that Meehan and the program had authority to keep her in the clinic, against her will.

76.     On August 1, Meehan informed Tina that she would remain in the clinic indefinitely, while they determined what to do with her; including the possibility of sending her back to the United States. Meehan informed Tina that if she refused continued in-patient care, she would be automatically removed from the overseas studies program.

77.     On August 3, Tina's fifth day in residential treatment, Dean of Students Griffith and Residence Dean Thiedeman told her over the phone that they were placing her on a leave of

absence. They also told Tina she would need to participate in a thirty-day therapy treatment program.

78.    Tina's doctors recommended against the thirty-day program. Stanford required it anyway.

79.    Griffith and Thiedeman alluded to Stanford's leave of absence policy as a basis for placing Tina on a leave of absence.  They claimed that Tina was disruptive to her classmates and academic program, and that her needs exceeded the resources the university could provide.

80.    The next day, August 4, Tina's psychiatrist informed her that she was comfortable with discharging her to two days of outpatient treatment per week. When Tina shared this update with Griffith and Thiedeman, she learned that they had never spoken with her doctor.

81.    Tina's attending psychiatrist and supervisor at the Human Rights Media Centre wrote letters to Griffith to express frustration with Stanford's actions and their negative impact on Tina's mental health.

82.    At no time during these events did anyone from Stanford discuss the option of receiving reasonable accommodations that would allow any options other than taking a leave of absence.

83.    When Tina attempted to appeal the leave of absence, Stanford required her to submit a personal statement and participate in a three-hour video conference with a panel of administrators.

84.    During Tina's three-hour video conference to appeal the leave of absence, the administrators asked Tina how she would remedy the damage she had done to the community, despite the fact that she had not harmed anyone. Indeed, Tina's fellow students sent a letter of solidarity in support of Tina to Stanford.

85.    In that letter of solidarity, Tina's fellow students expressed concern for the well-being of all students, especially those with mental health disabilities, who were at that time or would in the future be enrolled in the overseas studies program. The students asked what Stanford's response to Tina would mean "for anyone in the future who considers reaching out to a staff member for support."

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

86.     Though her appeal was granted, Stanford conditioned Tina's reintegration into the overseas studies coursework and community upon her participation in a therapy treatment program consisting of three sessions of therapy per week for the remainder of the overseas studies program. She had to arrange and pay for transportation for the therapy herself.

87.     Throughout this process, Stanford aggravated Tina's symptoms, disregarded her and her parents' wishes and her doctors' recommendations, misinformed her of processes, and caused her harm. Rather than meaningfully conferring with Tina and her doctors, focusing on Tina's health, offering resources, and engaging in an interactive process with Tina to explore accommodations to enable Tina to remain in the most integrated setting appropriate; Stanford attempted to require Tina to engage in medical treatment against her doctors' recommendations, treated Tina as a liability, and unilaterally acted to force her to accept blame for disability-related behavior and isolate Tina from her community, while she was thousands of miles away from home.

## IV.     STANFORD'S LEAVE OF ABSENCE POLICY HAS HARMED PLAINTIFF ERIK X.

88.     Plaintiff Erik X. was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory policies and procedures related to mental health.

89.     Erik is a twenty-three year-old Stanford student who resides in Palo Alto, California during the academic year. A leader in several student organizations at Stanford, Erik maintains a 3.9 grade point average and has already been accepted to a Stanford coterminal master's program, to begin next year.

90.     Erik enrolled at Stanford in Fall 2012, during which he served on his dormitory's Frosh Council and earned excellent grades.

91.     On January 25, 2013, during Winter Quarter, Erik was hospitalized at Stanford Hospital after attempting suicide.

92.     Within twenty-four hours of his admission, Carolus Brown, a Residence Dean, sent Erik a text message that if Erik had met with him, this "incident" would not have happened.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   Brown also texted Erik that everyone in his dorm was talking about him. His harmful messages

2   triggered Erik into an anxiety attack.

3       93.     While he was hospitalized, Giammalva visited Erik to "inform[] [him]…that [he

4   was] referred to the Dean's Leave of Absence," and told Erik that he was not allowed on campus

5   while on leave.  Gaimmalva admonished that if Erik violated this term, he risked probation or

6   expulsion.

7       94.     Giammalva also coerced Erik into signing a voluntary leave of absence form.  He

8   told Erik that he had not yet been released from the hospital because of his failure to cooperate

9   and sign the form, and that it would be near impossible to return to Stanford without filling out

10  the form.

11      95.     Erik remained in Stanford Hospital until February 8, at which point he was

12  discharged directly to La Selva Mental Health Services, where he remained in residential

13  treatment for one month.

14      96.     On February 19, while Erik was receiving treatment at La Selva, Brown notified

15  Erik that Stanford had revoked his on-campus housing. The housing revocation letter cited

16  language from the Dean's Leave of Absence policy; noting that the revocation was due to Erik's

17  "[inability] or [unwillingness] to carry out substantial self-care obligations," and requiring a

18  "level of care…from the university community [that] [exceeded] the resources and staffing" that

19  the university could provide. The letter included no discussion of possible reasonable

20  accommodations or any acknowledgement of protections for students with disabilities.

21      97.     Erik wanted to appeal the decision, but residence deans strongly discouraged him

22  from doing so.

23      98.     By the time Erik was discharged from La Selva, Stanford had charged Erik's

24  account a $450 housing administrative fee to process the contract termination.

25      99.     At no time did Stanford staff attempt to discuss or engage in conversations related

26  to accommodations that might allow Erik to remain a student or remain in his housing.

27      100.    Erik returned to campus in Autumn Quarter 2014. Stanford imposed a number of

28  requirements and conditions on Erik's re-enrollment and return to on-campus housing, including

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Mental Health & Wellness Coalition, et al v. Stanford University*, **Case No.:**
**COMPLAINT**                                                                                    14

1  drafting and submitting a personal statement "demonstrat[ing] insight into the impact of [his]

2  behavior on others."

3      101.    Stanford also required Erik, in advance of his return, to provide a letter from his

4  treating clinician regarding his readiness to return, release his medical information so that

5  Stanford could speak directly with his treatment professionals, coordinate and participate in

6  numerous meetings with various Stanford staff members and administrators; and, upon return,

7  participate in off-campus mental health treatment multiple days per week, for which he had to

8  arrange and pay for transportation. Again, these requirements failed to acknowledge that Erik's

9  past acts were related to a disability, or any consideration of possible disability-based

10 accommodations.

11     102.    Throughout this process, Stanford's management of Erik's crisis and subsequent

12 case aggravated Erik's trauma and caused him harm. Rather than focusing on Erik's health and

13 engaging in an interactive process with Erik to explore accommodations to enable Erik to remain

14 in the most integrated setting appropriate; Stanford treated Erik as a liability, stripped Erik of his

15 decision-making power, forced him to accept blame for disability-related behavior, and punished

16 Erik by excluding him from campus and housing and subjecting him to onerous readmission

17 requirements.

18 ## V.    STANFORD'S LEAVE OF ABSENCE POLICY HAS HARMED PLAINTIFF
19           MENTAL HEALTH & WELLNESS COALITION

20

21     103.    Plaintiff Mental Health & Wellness Coalition ("the Coalition") is a membership

22 organization made up of nearly twenty student groups that focuses on student mental health and

23 wellness by raising awareness, sharing resources, and participating in long-term planning for

24 larger-scale efforts to improve mental health and wellness at Stanford.

25     104.    The Coalition has done significant work to identify the mental health needs of the

26 student body, raise awareness, and coordinate Stanford student mental health and wellness

27 resources to address those needs. This is in accordance with its mission to promote student

28 mental health and wellness, including goals of reducing stigma to create a campus climate that is

*DISABILITY RIGHTS ADVOCATES*
*2001 CENTER STREET, FOURTH FLOOR*
*BERKELEY, CALIFORNIA 94704-1204*
*(510) 665-8644*

---

*Mental Health & Wellness Coalition, et al v. Stanford University*, **Case No.:**
**COMPLAINT**                                                          **15**

amenable to students speaking out about mental health disabilities, and ensuring that students have the resources they need by increasing communication among existing student and administrative mental health groups and increasing the visibility of all such groups to the student body.

105.    The Coalition has also advocated for administrative changes to create a campus culture with reduced stigma around mental health and more on-campus resources available to students; such as a course to teach students wellness practices, a more diverse counseling center to reflect the Stanford student community, and additional mental health training for Stanford staff.

106.    The Coalition has developed and presented numerous comprehensive mental health and wellness trainings to Stanford Residential Education staff; including an overview of mental health disabilities, how staff can support students experiencing mental health disabilities, and how to navigate non-crisis situations such as speaking with students experiencing suicidal ideation or showing warning signs of harming themselves.

107.    Several of the Coalition's organizational members developed this training in response to gaps they identified in the services and support Stanford provides to students with mental health disabilities.

108.    In these trainings, the Coalition distributes a resource it created entitled "Your Resident was Placed on a 5150. Here's What to Do." This training document for Residential Education staff provides an introduction to involuntary hospitalizations for mental health treatment (called "a 5150" after the statute authorizing such hospitalizations). It discusses how staff can support students throughout processes such as hospitalization, subsequent mental health treatment, a leave of absence, and returning to Stanford.

109.    Several of the Coalition's member groups have missions to advocate on behalf of Stanford students; including those with mental health disabilities and/or who have taken time away from Stanford, to drive systemic and cultural change on campus to improve student mental health. Some are driven by missions to dispel misconceptions about suicide, raise awareness, and

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

encourage dialogue about mental health and wellbeing. Others provide peer support, or focus on promoting wellness and self-care so that all students can thrive at Stanford.

110. The Coalition annually hosts "Wellness Week," a week of events for students to raise awareness of a broad perspective of mental health and wellness. Events have included presenting on-campus mental health resources; peer support groups; self-care techniques such as yoga and journaling; suicide prevention training; and stigma-reduction such as movie screenings, open drop-in counseling hours, and "Take Back the Stigma."

111. The Coalition includes members who are Stanford students subject to the policies and practices at issue in this Complaint; including students with lived experience with mental health disabilities, suicidal ideation, suicide attempts, involuntary hospitalization for mental health treatment, and leaves of absence.

112. The issues at stake in this Complaint are germane to the Coalition's purpose.

113. The Coalition has been and continues to be injured as a direct result of Stanford's leave of absence policy. The Coalition's interests are adversely affected because it has expended and continues to expend resources to advocate for its members who are harmed by Stanford's discriminatory policies and practices.

114. In addition, the Coalition has members who have been and continue to be injured as a direct result of Stanford's discriminatory leave of absence policies and practices by being placed on a leave of absence themselves, or deterred from going to the counseling center because of Stanford's leave of absence policies.

## VI. STANFORD'S LEAVE OF ABSENCE POLICY HAS HARMED STUDENT EMILY W.

115. Emily W. is a recent Stanford graduate with a Bachelor of Arts degree in Psychology who was harmed by Stanford's discriminatory practices and procedures related to mental health.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

116.    As a Stanford student, Emily held a leadership role in the Sexual Health Peer Resources Center and served on a taskforce for sexual assault prevention. She also was an active member of the Stanford Axe Committee.

117.    Emily enrolled at Stanford in Fall 2012. In her first quarter, she formed a numerous friendships and earned a 3.5 grade point average.

118.    On February 3, 2013, while a student at Stanford, Emily was hospitalized for mental health treatment, after a suicide attempt.

119.    Within forty-eight hours of her attempt, Residence Dean Brown told her she was "a liability," and "people like you tend not to succeed," or words to that effect.

120.    On February 6, Brown revoked Emily's housing and gave Emily two days to move out of her dormitory. The housing revocation letter referenced elements of Stanford's leave of absence policy; including requiring care in excess of that which the university could provide, and the impact of Emily's behavior on her community. Additionally, Stanford charged Emily a $450 fee for "terminating" her housing contract.

121.    After Emily was discharged from the hospital, Brown referred her to Griffith to discuss a leave of absence. When Emily resisted taking a leave voluntarily, Stanford placed Emily on an involuntary leave of absence on February 9. Stanford placed her on a leave of absence without any consideration or discussion of reasonable accommodations that would allow her to remain.

122.    Within the twenty-four hours provided to submit a request for review, Emily sought review of her leave of absence decision on February 10 and, on February 11, sat before a panel of three administrators, who denied her appeal.

123.    In order to return to campus and university housing, Stanford required Emily to meet with on-campus counselors and administrators, and to sign a medical release to permit Stanford to communicate directly with her personal doctors, and to submit a personal statement "demonstrat[ing] insight into the impact of [her] behavior on others."

124.    When Stanford allowed Emily to return the following Fall Quarter, she was sexually assaulted, which led to her drinking and engaging in self-harm.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

125.    Stanford administrators called Emily in to discuss her behavior and how she was being a "distraction."

126.    Stanford's counselors determined that Emily's self-harm was a coping mechanism, rather than suicidality. Stanford's administrators, however, placed Emily on another leave of absence, claiming that Emily's self-harm was a "distraction to the community."

127.    Again, Stanford evicted Emily from on-campus housing, gave her less than three days to clean out and vacate her dormitory, and charged Emily a $450 fee for "terminating" her housing contract.

128.    Like before, Stanford required Emily to sign a medical release to permit Stanford to communicate directly with her personal doctors. Additionally, Stanford required Emily to draft and submit a personal statement that "demonstrate[d] insight into the cause(s) and impact(s) of [her] behavior."

129.    At no time in either instance did Stanford staff attempt to discuss or engage in conversations related to accommodations that might allow Emily to remain a student or remain in her housing.

130.    Throughout these processes, Stanford repeatedly stigmatized and blamed Emily, disregarded medical and counseling assessments, imposed unreasonably short deadlines for her to comply with onerous administrative requirements and uproot her life, and caused her harm. Rather than meaningfully conferring with Emily and her doctors and counselors, focusing on Emily's health, offering resources, and engaging in an interactive process with Emily to explore accommodations to enable her to remain in the most integrated setting appropriate, Stanford treated Emily as a liability, stripped Emily of her decision-making power, forced her to accept blame for disability-related behavior, and punished Emily by excluding her and subjecting her to onerous readmission requirements.

## CLASS ALLEGATIONS

131.    Plaintiffs' and other students' experiences are examples of an ongoing systemic pattern of Stanford discriminating against students with mental health disabilities.

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

132.   Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf and on behalf of all putative class members. Plaintiffs do not seek money damages. The class that the named Plaintiffs seek to represent is composed of all Stanford students who have a mental health disability (or have been regarded as having a disability or have a record of a disability) who have been or may be subject to Stanford's leave of absence policies and practices, including students who have been deterred from participating in the programs and services Stanford makes available to its students because they are aware of these policies and practices and fear being subjected to them.

133.   Each Plaintiff and member of the proposed class is a "qualified person with a disability" and/or person with "a disability" pursuant to federal and state anti-discrimination laws, as alleged herein.

134.   The persons in the class are so numerous that joinder of all such persons is impractical and the disposition of their claims in a class action is a benefit to the parties and to the Court.

135.   While the exact number of class members is unknown to named Plaintiffs at this time, the proposed class far exceeds 40 members. Stanford had 7,032 enrolled undergraduate students in the 2016–17 academic year. A 2014 Stanford Daily Survey found that, from more than 500 Stanford student respondents, thirty-one percent had experienced depression while at Stanford and fifty-one percent spent most of their time at a stress level of seven or eight out of ten. Additionally, a 2015 ASSU Mental Health Survey found that, from 1,687 Stanford student respondents, eighty-three percent desired more resources to deal with stress, and seventy-nine percent desired more resources to deal with depression/anxiety.

136.   There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that they are Stanford students who have been harmed and excluded from Stanford's academic, housing, and related services, through its discriminatory leave of absence policies and practices.

---

*Mental Health & Wellness Coalition, et al v. Stanford University*, **Case No.:**
**COMPLAINT**                                                                    20

137.   Common questions of law and fact predominate; including questions raised by Plaintiffs' allegations that Stanford's leave of absence policies and practices:

    a)    Discriminate against and exclude students with mental health disabilities from its programs and services; and

    b)    Cause students with mental health disabilities to be deterred from using Stanford's programs, including mental health services, based on their fear of being so discriminated against and excluded.

138.   The claims of the named Plaintiffs are typical of the claims of the class as a whole because Stanford's leave of absence policies and practices have led to excluding the named Plaintiffs from Stanford's programs and services on the basis of their mental health disabilities. Named Plaintiffs are also deterred from using Stanford's programs for fear of being subjected to that exclusion again.

139.   Additionally, the named Plaintiffs are adequate class representatives because they have been and remain at risk of being directly affected by Stanford's discriminatory leave of absence and related policies and practices; and their interests are not antagonistic to, nor in conflict with, the interests of the class as a whole.

140.   The attorneys representing the class are experienced in disability law and in class action institutional reform litigation. Plaintiffs' counsel is qualified to fully prosecute this litigation and possesses adequate resources to see this matter through to a resolution.

141.   Stanford has acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## FIRST CAUSE OF ACTION

### Violation of Title III of the Americans with Disabilities Act

### 42 U.S.C. § 12182, *et seq.*

142.   Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

143. Title III of the Americans with Disabilities Act ("ADA") and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

144. At all times relevant to this action, Plaintiffs and members of the proposed class were and are enrolled Stanford students who have a disability, were regarded as having a disability, or have a record of a disability, and thus were qualified individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

145. At all times relevant to this action, Stanford has been and is a "place of public accommodation" within the meaning of Title III of the ADA, as an undergraduate or postgraduate school, or other place of education. 42 U.S.C. § 12181(7)(J).

146. Title III prohibits public accommodations from denying or affording an unequal opportunity to an individual or class of individuals with disabilities, on the basis of a disability, the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

147. Title III provides that goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual. 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

148. Title III provides that an individual or entity shall not utilize standards or criteria or methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disabilities cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

149. Title III further defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages,

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

150.     Regulations implementing Title III prohibit public accommodations from imposing a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required under the ADA and its implementing regulations. 28 C.F.R. § 36.301(c).

151.     Stanford has violated Title III of the ADA by denying Plaintiffs and members of the proposed class, on the basis of disability, the opportunity to fully and equally enjoy, participate in, and benefit from Stanford's goods, services, facilities, privileges, advantages, and accommodations.

152.     Stanford has violated Title III of the ADA by maintaining and executing a leave of absence policy that utilizes eligibility criteria and methods of administration that have the effect of discriminating against students with mental health disabilities by tending to screen them out of—and make it more onerous for them to regain access to—campus services, facilities, privileges, advantages, and accommodations, on the basis of disability.

153.     Stanford has violated Title III of the ADA by failing to make reasonable modifications to its leave of absence policies, practices, or procedures to ensure that Plaintiffs and members of the proposed class have equal access to the benefits of Stanford's goods, services, facilities, privileges, advantages, and accommodations.

154.     Stanford has violated Title III of the ADA by failing to provide Plaintiffs and members of the proposed class goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to their needs.

155.     Stanford's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, Stanford will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs and members of the proposed class have no adequate remedy at law. Consequently, Plaintiffs and members of the proposed

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   class are entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188), as

2   well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

3       156.   WHEREFORE, Plaintiffs and members of the proposed class request relief as set

4   forth below.

### SECOND CAUSE OF ACTION

**Violation of Section 504 of the Rehabilitation Act of 1973**

**29 U.S.C. § 794, *et seq.***

8       157.   Plaintiffs incorporate by reference the foregoing allegations as if set forth fully

9   herein.

10      158.   Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that

11  otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be

12  excluded from participation in, be denied the benefits of, or be subjected to discrimination under

13  any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R.

14  § 104.4(a).

15      159.   As individuals with mental health disabilities or who have a record thereof or who

16  have been regarded as having a disability, Plaintiffs and members of the proposed class are

17  persons with disabilities within the meaning of Section 504. 29 U.S.C. § 794(a); 29 U.S.C.

18  § 705(20). As admitted and current students, Plaintiffs and members of the proposed class are

19  otherwise qualified to participate in Stanford's services, programs, and activities. 34 C.F.R.

20  § 104.3(l)(3).

21      160.   As a university, Stanford's operations are qualified programs or activities within

22  the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.41. As

23  an educational institution which permits students to pay education-related costs with the

24  assistance of Federal grants and loans, and has done so at all times relevant to the claims asserted

25  in this Complaint, Stanford is a recipient of Federal financial assistance sufficient to invoke

26  Section 504 coverage. 34 C.F.R. § 104.3(h).

27      161.   Section 504 implementing regulations promulgated by the Department of

28  Education ("DOE regulations") provide that recipients of Federal financial assistance, in

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

providing any aid, benefit, or service, may not, on the basis of disability, discriminate against an otherwise qualified person with a disability by providing them with an opportunity to participate in or benefit from the aid, benefit, or service that is different, separate, not equal, or not as effective as that which is afforded others. 34 C.F.R. § 104.4(b)(1)(i)–(iv).

162.    DOE regulations further prohibit recipients of Federal financial assistance from limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving any aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

163.    DOE regulations prohibit recipients of Federal financial assistance from utilizing criteria or methods of administration, including within its admission policies, that have an adverse effect on persons with disabilities, or that have the purpose or effect of defeating or substantially impairing accomplishment of the recipient's program or activity objectives with respect to qualified persons with disabilities. 34 C.F.R. §§ 104.4(b)(4), 104.42(b)(2).

164.    DOE regulations provide that no qualified student with a disability shall, on the basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, research, housing, health insurance, counseling, financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services. 34 C.F.R. § 104.43(a). *See also* 34 C.F.R. §§ 104.43(c), 104.52(a)(1).

165.    DOE regulations require covered entities to operate their program or activity in the most integrated setting appropriate. 34 C.F.R. § 104.43(d).

166.    Stanford has violated Section 504 by denying Plaintiffs and members of the proposed class the benefits of their programs services and activities on the basis of disability.

167.    Stanford has violated Section 504 by maintaining rules, including eligibility criteria and methods of administration, that have the effect of discriminating against students with mental health disabilities by tending to screen them out of maintaining student status and access to campus resources, including housing, on the basis of disability.

168.    As a proximate result of Stanford's violations of Section 504 of the Rehabilitation Act, Plaintiffs and members of the proposed class have been injured as set forth herein.

169.    Because Stanford's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to 29 U.S.C. § 794a.

170.    Plaintiffs and members of the proposed class have no adequate remedy at law and unless the relief requested herein is granted, Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied access to Stanford's programs and services. Consequently, Plaintiffs and members of the proposed class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C. § 794a(a)(2) & (b).

171.    WHEREFORE, Plaintiffs and members of the proposed class request relief as set forth below.

## THIRD CAUSE OF ACTION

### Violation of the Fair Housing Act

### 42 U.S.C. § 3601, *et seq.*

172.    Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

173.    The Fair Housing Act prohibits discrimination in the terms, conditions, sale, or rental of a dwelling, on the basis of disability. 42 U.S.C. § 3604(f)(1)–(2). *See also* 24 C.F.R. §§ 100.20, 100.60(a), 100.60(b)(2).

174.    As persons with mental health disabilities, Plaintiffs and members of the proposed class are protected from discrimination under the Fair Housing Act. 42 U.S.C. § 3602(h). *See also* 24 C.F.R. § 100.201.

175.    Stanford's residence halls are covered "dwellings" under the Fair Housing Act. *See* 42 U.S.C. § 3602(b), (c). *See also* 24 C.F.R. § 100.201.

176.    The Fair Housing Act prohibits discrimination in the form of refusing to make reasonable accommodations in rules, policies, practices, or services, when such may be

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling.

2  42 U.S.C. § 3604(f)(3)(B).

3      177.   Under the Fair Housing Act, it is unlawful to coerce, intimidate, threaten, or

4  interfere with any person in the exercise or enjoyment of any right granted or protected by

5  section 3604 of the Fair Housing Act. 42 U.S.C. § 3617.

6      178.   Housing and Urban Development ("HUD") regulations implementing the Fair

7  Housing Act clarify that prohibited actions include using different criteria, standards,

8  requirements, rental procedures, or lease or contract provisions, because of disability. 24 C.F.R.

9  §§ 100.60(b)(4), 100.65(b)(1).

10     179.   Prohibited actions further include limiting the use of a dwelling's privileges,

11 services, or facilities, or evicting tenants because of disability. 24 C.F.R. §§ 100.60(b)(5),

12 100.65(b)(4).

13     180.   Stanford has violated the Fair Housing Act by maintaining and implementing

14 terms and conditions of housing that exclude and otherwise discriminate against Plaintiffs and

15 members of the proposed class on the basis of disability.

16     181.   Stanford has further violated the Fair Housing Act by refusing to make reasonable

17 accommodations in rules, policies and services, when such accommodations may be necessary to

18 afford Plaintiffs and members of the proposed class equal opportunities to use and enjoy their

19 residence halls.

20     182.   Stanford has violated HUD regulations implementing the Fair Housing Act by

21 utilizing criteria, standards, and requirements that discriminate against Plaintiffs and members of

22 the proposed class on the basis of disability, including requiring them to submit personal

23 statements and medical documentation in advance of being readmitted to residence halls.

24     183.   WHEREFORE, Plaintiffs and members of the proposed class request relief as set

25 forth below.

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## FOURTH CAUSE OF ACTION

### Violation of the Unruh Civil Rights Act

### California Civil Code § 51, *et seq.*

184.  Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

185.  The California Unruh Civil Rights Act ("Unruh Act") provides that all persons in California are free and equal, and no matter their disability, are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. Cal. Civ. Code § 51(b).

186.  As persons with mental health disabilities, Plaintiffs and members of the proposed class are persons with disabilities within the meaning of the Unruh Act. Cal. Civ. Code § 51(e)(1). *See also* Cal. Gov. Code §§ 12926(j), 12926.1.

187.  Stanford is a business establishment within the jurisdiction of the state of California, and as such is obligated to comply with the provisions of the Unruh Act. Cal. Civ. Code §51, *et seq.*

188.  Stanford has violated the Unruh Act by excluding students with mental health disabilities from fully and equally enjoying Stanford's academic, housing, and related services and programs.

189.  The Unruh Act also provides, *inter alia,* that a violation of the ADA shall also constitute a violation of the Unruh Act. Cal. Civ. Code § 51(f).

190.  Stanford's discriminatory conduct alleged herein includes, *inter alia*, the violation of the rights of persons with disabilities set forth in Title III of the ADA and therefore also violates the Unruh Act.

191.  Stanford's actions have violated and continue to violate the Unruh Act and therefore Plaintiffs and members of the proposed class are entitled to injunctive relief to remedy the discrimination, as well as reasonable attorneys' fees. Cal. Civ. Code §§ 52, 52.1(b), (h).

192.  WHEREFORE, Plaintiffs and members of the proposed class request relief as set forth below.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## FIFTH CAUSE OF ACTION

### Violation of California Government Code § 11135

193.    Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

194.    California Government Code § 11135 ("Section 11135") provides that no person with a disability in the State of California shall, on the basis of disability, "be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity" that receives any financial assistance from the state. Cal. Gov. Code § 11135(a).

195.    As persons with mental health disabilities, Plaintiffs and members of the proposed class are protected by this code. Cal. Gov. Code § 11135(c). *See also* Cal. Gov. Code §§ 12926(j)(1)–(2).

196.    As an educational institution which permits students to pay education-related costs with the assistance of California grants, and has done so at all times relevant to the claims asserted in this Complaint, Stanford is a recipient of state financial assistance sufficient to invoke Section 11135 coverage.

197.    Stanford has denied Plaintiffs and members of the proposed class full and equal access to the benefits of Stanford's programs and activities, on the basis of disability.

198.    As a proximate result of Stanford's violations of Section 11135, Plaintiffs and members of the proposed class have been injured as set forth herein.

199.    Plaintiffs and members of the proposed class have no adequate remedy at law. Unless the relief requested herein is granted, Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied full access to Stanford's facilities, programs, services, and activities on the basis of disability. Consequently, Plaintiffs and members of the proposed class are entitled to injunctive relief and reasonable attorneys' fees and costs.

200.    WHEREFORE, Plaintiffs and members of the proposed class request relief as set forth below.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## SIXTH CAUSE OF ACTION

### Violation of the California Fair Employment and Housing Act

### California Government Code § 12900, *et seq.*

201.    Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

202.    California's Fair Employment and Housing Act ("FEHA") prohibits housing accommodations from discriminating against or harassing individuals on the basis of disability. Cal. Gov. Code § 12955(a).

203.    As individuals with mental health disabilities, Plaintiffs and members of the proposed class are covered under this Act. Cal. Gov. Code §§ 12955.3, 12926(j)(1)–(2).

204.    Stanford's residence halls are housing accommodations covered under this Act. Cal. Gov. Code § 12927(d). Additionally, as a California business establishment subject to the Unruh Civil Rights Act that provides housing accommodations, Stanford is a covered entity under this Act. Cal. Gov. Code § 12955(d).

205.    FEHA prohibits refusing to rent, terminating a rental agreement, or otherwise making unavailable or denying a dwelling based on disability. Cal. Gov. Code §§ 12927(c)(1),12955(k).

206.    FEHA further prohibits housing accommodation owners from making any written or oral inquiry concerning the disability of any person seeking to rent any housing accommodation. Cal. Gov. Code § 12955(b).

207.    FEHA further defines discrimination to include harassment or providing inferior terms, conditions, privileges, facilities, or services in connection with housing accommodations. Cal. Gov. Code § 12927(c)(1).

208.    FEHA further defines discrimination to include refusal to make reasonable accommodations in rules, policies, practices, or services when those accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy the dwelling. Cal. Gov. Code § 12927(c)(1).

209.    Stanford has violated FEHA by terminating rental contracts and excluding students with mental health disabilities from its residence halls, because of disability.

210.    Stanford has violated FEHA by requiring students with mental health disabilities to submit medical documentation in advance of allowing them readmission to the residence halls.

211.    Stanford has further violated FEHA by refusing to make reasonable accommodations to policies and procedures to allow students with mental health disabilities to remain in housing or to waive housing cancellation fees when it unilaterally terminates students' housing contracts on the basis of disability.

212.    WHEREFORE, Plaintiffs and members of the proposed class request relief as set forth below.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief

213.    Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

214.    An actual controversy has arisen and now exists between the parties in that Plaintiffs and members of the proposed class contend, are informed, and believe that Stanford denies that it is violating Title III of the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws, by excluding students with mental health disabilities from its programs and services and causing students with mental health disabilities to be deterred from using  Stanford services due to fear of being so excluded.

215.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

216.    WHEREFORE, Plaintiffs and members of the proposed class request relief as set forth below.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

**REQUEST FOR RELIEF**

217.    WHEREFORE, Plaintiffs and members of the proposed class request relief as follows:

218.    An order certifying this case as a class action under Fed. R. Civ. P. 23(a); and 23(b)(2) appointing Plaintiffs as class representatives, and their attorneys as class counsel.

219.    A declaration that Stanford's conduct as alleged herein has violated and continues to violate the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws.

220.    An order enjoining Stanford and its employees, agents, and any and all other persons acting on Stanford's control from violating the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws.

221.    A permanent injunction pursuant to the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws requiring Stanford to modify its policies and procedures to ensure that students with mental health disabilities have nondiscriminatory, full and equal access to academic, housing, health, insurance, and all other facilities, services, and activities provided by Stanford.

222.    Award Plaintiffs' attorneys' fees and costs, as provided by statute.

223.    Such other and further relief as the Court deems just and proper.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    DATED:  May 17, 2018                    Respectfully submitted,

2

3                                            DISABILITY RIGHTS ADVOCATES

4

5    _____

6                                            Stuart Seaborn
                                             Monica Porter
7                                            Disability Rights Advocates
                                             2001 Center Street, Fourth Floor
8                                            Berkeley, California  94704-1204
                                             Telephone:      (510) 665-8644
9                                            Facsimile:      (510) 665-8511
                                             sseaborn@dralegal.org
10                                           mporter@dralegal.org

11                                           Maia Goodell (*Pro Hac Vice* Admission Pending)
                                             Disability Rights Advocates
12                                           655 Third Avenue, 14th Floor
                                             New York, New York 10017
13                                           Telephone:      (212) 644-8644
                                             mgoodell@dralegal.org

14                                           *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Mental Health & Wellness Coalition, et al v. Stanford University*, Case No.:
**COMPLAINT**                                                                    33