1
STUART SEABORN (CA BAR NO. 198590)
MONICA PORTER (CA BAR NO. 311974)
2
Disability Rights Advocates
2001 Center Street, Fourth Floor
3
Berkeley, California 94704-1204
Telephone:    (510) 665-8644
4
Facsimile:     (510) 665-8511
sseaborn@dralegal.org
5
mporter@dralegal.org

6
MAIA GOODELL (Admitted *Pro Hac Vice*)
Disability Rights Advocates
7
655 Third Avenue, 14th Floor
New York, New York 10017
8
Telephone:    (212) 644-8644
mgoodell@dralegal.org
9

10
*Attorneys for Plaintiffs*

11

12                **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14

15
Mental Health & Wellness Coalition, Erik X.,          **AMMENDED COMPLAINT FOR**
16
Tina Y., Jacob Z., Harrison Fowler, Rose A.,          **INJUNCTIVE AND DECLARATORY**
Sofia B.,                                             **RELIEF**
17
               Plaintiffs,                            **CLASS ACTION**
18
v.
19
The Board of Trustees of the Leland Stanford
20
Junior University D/B/A Stanford University,
21
22                Defendant.

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## **INTRODUCTION**

1.      This class-action lawsuit seeks to put an end to Stanford University's punitive, illegal, and discriminatory treatment of students with mental health disabilities.

2.      Despite being a highly selective university regularly ranked in the top five nationally and globally and charging tuition in the range of $50,000 per year, Stanford maintains antiquated policies, practices, and procedures related to mental health that violate anti-discrimination laws.

3.      This is especially troubling in light of the surging numbers of college students reporting declining mental health as they struggle with challenges, such as being away from home for the first time, and pressures related to drugs, alcohol, and dating; all while juggling the rigorous demands of academics, especially at an elite institution such as Stanford.

4.      Recent studies of college students indicate record numbers of students dealing with depression, anxiety, eating disorders, and other mental health disabilities.

5.      The National Council on Disability, for example, recently found that thirty-five percent of students met the criteria for at least one mental health disorder, and twenty percent of students have considered suicide at some point during their college career.

6.      Suicide is the second leading cause of death among college students.

7.      Ninety percent of those who die by suicide had a diagnosable mental health disability at the time of their death.

8.      Students who receive mental health support are more likely to stay in school and to graduate.

9.      Yet, only half of college students experiencing a mental health crisis seek help, largely due to the justified fear of stigma and negative consequences.

10.     Too often, universities respond to disability-related behavior with exclusion, blame, and draconian measures such as a forced leave of absence.

11.     Stanford is a particularly egregious example. Stanford has a blanket practice of immediately ejecting students from its programs and housing when students engage, or are

1  perceived to be at risk of engaging in, self-harm due to a mental health disability. Stanford also

2  pressures such students, immediately after reports of crisis behavior, into taking leaves of

3  absence; requiring immediate withdrawal from all classes, programs, and housing, without an

4  individualized evaluation of reasonable accommodations.

5        12.     Further perpetuating mental health stigma and additional harm, Stanford requires

6  students wishing to return to the University to write statements accepting blame for their

7  disability-related behavior and to submit to invasive examination of their medical records and

8  evaluations by university doctors who second-guess the students' treating doctors. Stanford also

9  mandates costly and time-consuming treatment plans in addition to those recommended by the

10 students' doctors.

11       13.     Stanford's policies, practices, and procedures amount to illegal disability

12 discrimination and must be ceased immediately.

<b><u>JURISDICTION AND VENUE</u></b>

14       14.     This is an action for declaratory and injunctive relief, brought pursuant to the

15 Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*; Section 504 of the

16 Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, *et seq.*; the Fair Housing Act, 42 U.S.C.

17 § 3601, *et seq.*; the Unruh Civil Rights Act, Cal. Civ. Code § 51, *et seq.*; California Government

18 Code § 11135; and the California Fair Employment and Housing Act, Cal. Gov. Code § 12900,

19 *et seq.*

20       15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for

21 Plaintiffs' claims arising under the ADA, Section 504, and the Fair Housing Act. This Court has

22 supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for claims arising under the Unruh

23 Civil Rights Act, California Government Code § 11135, and the California Fair Employment and

24 Housing Act.

25       16.     Venue is proper in the Northern District of California pursuant to 28 U.S.C.

26 § 1391(b), because: (1) Stanford and its real property are located in the District, and (2) a

27 substantial part of the events or omissions giving rise to the claims occurred within the District.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

*Mental Health & Wellness Coalition et al. v. The Board of Trustees of the Leland Stanford Junior University*
**Case No.: 5:18-cv-02895-NC**
**Amended Complaint**     **2**

17.     Pursuant to the Northern District of California Civil Local Rules 3-2(c), (e), because this action arises in Santa Clara County, this action should be assigned to the San Jose Division.

## **PARTIES**

18.     Plaintiff Jacob Z.[1] is a twenty-year-old Stanford student who resides in Stanford, California during the academic year and is currently residing in San Jose, California, as he is currently on an imposed leave of absence. He is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While he was a student at Stanford and participating in residential mental health treatment, Stanford discriminated against Jacob on the basis of disability by barring him from the campus community and imposing onerous requirements for him to return.

19.     Plaintiff Tina Y. is a twenty-three-year-old Stanford student who typically resides in Stanford, California during the academic year. She is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While participating in Stanford's overseas studies program, Tina was hospitalized for mental health treatment. Stanford subsequently discriminated against Tina on the basis of disability by barring her from the overseas studies program and imposing onerous requirements for her to return.

20.     Plaintiff Erik X. is a twenty-four-year-old Stanford student who resides in Stanford, California during the academic year. Erik is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While he was a student at Stanford and in the hospital for mental health treatment, Stanford discriminated against Erik on the basis of disability by barring him from the campus community and imposing onerous requirements for him to return.

---

[1] Individual Plaintiffs are identified with pseudonyms. Pursuant to the Parties' Stipulation (ECF No. 14), the Court's Order Granting Permission to Proceed Using Fictitious Names (ECF No. 16), and Federal Rule of Civil procedure 5.2, Plaintiffs will file under seal a supplemental reference list giving corresponding true names.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

21.     Plaintiff Harrison Fowler is a nineteen-year-old Stanford student who initially resided in Stanford, California during the academic year and is currently residing in Beaumont, Texas, as he is currently on an imposed leave of absence. Harrison is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While he was a student at Stanford and in the hospital for mental health treatment, Stanford discriminated against Harrison on the basis of disability by barring him from the campus community and imposing onerous requirements for him to return.

22.     Plaintiff Rose A. is a nineteen-year-old Stanford student who initially resided in Stanford, California during the academic year and is currently residing in Melbourne, Australia, as she is currently on an imposed leave of absence. Rose is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While she was a student at Stanford and in the hospital for mental health treatment, Stanford discriminated against Rose on the basis of disability by barring her from the campus community and imposing onerous requirements for her to return.

23.     Plaintiff Sofia B. is a twenty-one-year-old Stanford student who resides in Stanford, California during the academic year. Sofia is a qualified individual with a disability for purposes of the ADA, Section 504, the Fair Housing Act, and related state laws. While she was a student at Stanford and in the hospital for mental health treatment, Stanford discriminated against Sofia on the basis of disability by barring her from the campus community and imposing onerous requirements for her to return.

24.     Plaintiff Mental Health & Wellness Coalition ("the Coalition") is a membership organization made up of more than twenty student groups focused on raising awareness and advocating for administrative changes pertaining to student mental health and wellness. The Coalition has been directly injured by Stanford's leave of absence policies through frustration of its mission to promote student mental health and wellness, and through diversion of its resources. The Coalition has developed and presented trainings to Stanford staff on how to support students who are hospitalized for mental health treatment and subsequently placed on a leave of absence.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   Additionally, the Coalition has members who have been directly harmed by Stanford's leave of

2   absence policies by being placed on a leave of absence themselves, or deterred from utilizing

3   campus counseling services because of Stanford's leave of absence policies.

4       25.    Defendant The Board of Trustees of the Leland Stanford Junior University is

5   custodian of the endowment and all the properties of Stanford University, and does business as

6   "Stanford University." The Board administers the invested funds, sets the annual budget, and

7   determines policies for operation and control of the University. The Board delegates broad

8   operational authority to the president of the University.

9       26.    Stanford University is a private university located in Stanford, California. As a

10  place of education, Stanford qualifies as a "place of public accommodation" under Title III of the

11  ADA as that term is defined under 42 U.S.C. § 12181(7)(J). Stanford is also a recipient of federal

12  financial assistance within the meaning of Section 504 of the Rehabilitation Act and a recipient

13  of state financial assistance within the meaning of California Government Code § 11135.

14      27.    Throughout this complaint, Plaintiffs refer to Defendant as "Stanford" or

15  "University."

16                  **FACTUAL ALLEGATIONS**

17      28.    Stanford is a highly-selective, elite university; ranking fifth among national

18  universities and third in global rankings, Stanford admits fewer than five percent of applicants

19  and enrolls fewer than four percent of applicants.

20      29.    Stanford's student body, like those at other higher education institutions, is

21  experiencing high rates of mental health disabilities.

22      30.    In the 2016–17 academic year, Stanford had more than 16,000 enrolled students;

23  including more than 7,000 undergraduates and more than 9,000 graduate students.

24      31.    Full-time undergraduate and graduate tuition at Stanford is around $50,000 per

25  year.

26

27

28

*Mental Health & Wellness Coalition et al. v. The Board of Trustees of the Leland Stanford Junior University*
Case No.: 5:18-cv-02895-NC
**Amended Complaint**        **5**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

32.     Approximately ninety-seven percent of all Stanford undergraduates live in campus housing, which costs around $15,000 per year. Even among graduate students, about sixty-five percent of those eligible live in university-provided housing.

33.     Also on campus is Stanford Hospital, including an emergency room and inpatient psychiatric facilities, where most students requiring emergency mental health treatment receive such services.

## I.     STANFORD'S LEAVE POLICIES DISCRIMINATE AGAINST STUDENTS WITH MENTAL HEALTH DISABILITIES

34.     Stanford's "Dean's Leave of Absence Policy" includes language subjecting students to mandatory leaves of absence—effectively excluding them from all campus programs and activities—when Stanford perceives that their mental health disability may put that student's own life or safety at risk.

35.     Stanford has recently codified a housing policy that mirrors the language of the Dean's Leave of Absence Policy. This policy provides for housing "holds" that eject students from University housing and bar them from returning during the "hold" period where the student is at "risk of harm to self." Though the new written policy includes language regarding reasonable accommodations in connection with self-care obligations, it contains no such language regarding students with mental health disabilities who are at risk of self-harm. Nor does the language regarding removal from housing based on a risk of self-harm mention or acknowledge any disability rights protections.

36.     In practice, Stanford applies these policies on a blanket basis to exclude students with mental health disabilities who are hospitalized; immediately barring them from the University community, prohibiting them from being present on campus, and removing them from their housing.

37.     Stanford fails to conduct individualized assessments prior to banning such students to consider whether Stanford could provide reasonable accommodations to enable the

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    students to remain on campus, whether the student will have adequate supports while on leave,

2    or whether Stanford's actions will further endanger the at-risk student.

3        38.    Stanford imposes leaves of absence on students with mental health disabilities

4    who resist coercive efforts to go on leave voluntarily, and systematically discourages students

5    from appealing mandated leaves.

6        39.    Stanford does not even allow most students who are placed on a leave of absence

7    while still in the hospital receiving mental health treatment to return to their dormitories to

8    collect their belongings.

9        40.    Adding insult to injury, Stanford charges students hundreds of dollars in various

10   administrative fees and costs related to their involuntary dismissal; such as for changing their

11   academic schedule and terminating their housing contract.

12       41.    Stanford also imposes onerous requirements on students who wish to return to the

13   university; such as signing a release of medical information to permit Stanford to speak directly

14   with private healthcare providers, committing to costly and time-intensive treatment plans other

15   than those prescribed by their healthcare providers, and submitting a personal statement in which

16   the student accepts blame for their disability-related behaviors. Stanford imposes these

17   requirements without acknowledging any rights or protections on the basis of the disability or

18   engaging in an interactive process with the student to discuss appropriate disability-based

19   accommodations.

20   **II.    STANFORD'S LEAVE POLICIES HAVE HARMED NAMED PLAINTIFFS AND**

21   **OTHERS SIMILARLY SITUATED**

22   **A.    Plaintiff Jacob Z.**

23       42.    Plaintiff Jacob Z. was harmed and faces the ongoing possibility of being harmed

24   in the future by Stanford's discriminatory leave policies.

25       43.    Jacob is twenty years old and has a mental health disability. He is currently on a

26   leave of absence from Stanford.

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

44.     Jacob lives in Stanford, California during the academic year, but is currently residing in San Jose, California.

45.     Since first enrolling at Stanford in Fall Quarter 2016, Jacob has been a leader and contributor in several student organizations and maintained a 4.0 grade point average.

46.     In early January 2018, during the second week of Winter Quarter, Jacob experienced suicidal ideation. He consulted with his psychiatrist at Stanford's on-campus Counseling and Psychological Services ("CAPS") office and, pursuant to their instruction, asked a friend to hold onto his Tylenol.

47.     On February 20, 2018, while adjusting to a prescribed medication as part of his mental health treatment, Jacob experienced suicidal ideation while in his dorm room. As planned in advance with his therapist in such an instance, Jacob reached out to a friend for help.

48.     While on the phone with a friend, Jacob's roommate returned to their room and Jacob opened the door to let him in. Jacob then spoke with his roommate, another friend, and his Resident Assistant ("RA"), and he walked with them to the Vaden Health Center to speak with a treatment provider. In speaking with treatment providers about options, Jacob agreed to an involuntary psychiatric hold at Stanford Hospital, and went to the hospital for mental health treatment.

49.     On February 23, while Jacob was still in the hospital, John Giammalva, a Residence Dean, visited him and told him that he had caused his dormmates psychological harm and that they were talking about him. Giammalva said that Jacob had been a disruption to the community and it was unfair for him to impose a burden on other students and staff. Giammalva also referred to Stanford's residence agreement, made Jacob feel he had violated the rules, and threatened Jacob with legal action and a ban from his dormitory.

50.     Jacob felt traumatized by this conversation and requested that hospital staff be present for any future conversations with Giammalva.

51.     After this conversation, Jacob felt like he no longer had a support system at Stanford and did not reach out to friends at Stanford because he feared being penalized. When

---

*Mental Health & Wellness Coalition et al. v. The Board of Trustees of the Leland Stanford Junior University*
Case No.: 5:18-cv-02895-NC
**Amended Complaint**                                                                                         **8**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   Jacob was reunited with his friends, they assured him that Giammalva's statements about the

2   impact he had had on them were not true.

3          52.    On February 26, while Jacob was still in the hospital, he met with Leigh

4   Thiedeman, another Residence Dean, who told him that he would be placed on a housing hold

5   and a Dean's Leave of Absence.

6          53.    On February 28, the hospital discharged Jacob directly to La Selva Mental Health

7   Services ("La Selva"), a private treatment facility in Palo Alto, for residential treatment.

8          54.    On March 5, while Jacob was engaged in treatment at La Selva, he received a

9   letter from Giammalva notifying him that Stanford had revoked his on-campus housing and

10  "prohibited [Jacob] from setting foot in all Stanford residential areas (including residences and

11  dining halls)." The housing hold letter cited language from the Dean's Leave of Absence Policy;

12  noting that Stanford was revoking his housing due to his "inability to care for [his] personal

13  safety" and "unreasonable level of care required from friends and staff."

14         55.    The letter further cited to Stanford's Residence Agreement and Fundamental

15  Standards of Conduct and chastised Jacob for violating those standards by failing to "be

16  considerate of other residents and staff," "respect the rights of others," and show "respect for

17  order, morality, [and] personal honor." The letter mentioned nothing about Jacob's behavior

18  being connected to or the result of a disability, nor any possible disability-based

19  accommodations.

20         56.    Stanford also initially charged Jacob's account a $450 housing administrative fee

21  to process the contract termination.

22         57.    Jacob reached out to Residence Dean Thiedeman by email to schedule a phone

23  call to clarify the reasons for his housing hold. Over the phone, Thiedeman responded vaguely;

24  admitting she had not spoken with Jacob's friends but claiming that unidentified other people

25  had, and had determined there was an impact on his friends. Thiedeman's insistence that Jacob

26  likely harmed his friends interfered with his recovery.

27

28

58. On March 6, Jacob received a letter from Chris Griffith, Associate Vice Provost and Dean of Students, regarding the leave of absence. The letter purported to outline concerns regarding Jacob asking his peers for help in addition to working with his treatment team at CAPS. At the same time as it chastised Jacob for seeking support outside of formal university channels, the letter claimed that his "situation required a level of support from University staff and students that was unsustainable and for which they did not have the professional expertise to manage."

59. Jacob's friends assured him during in-person visits that they had not been contacted by Stanford's administration. Jacob's roommate even sent a letter to Griffith to clarify the events leading to Jacob's hospitalization and request that she reconsider her decision.

60. At no point did anyone from Stanford discuss any accommodations or speak with Jacob about options other than a leave of absence.

61. Stanford left Jacob to look into options and coordinate administrative processes with faculty and staff on his own; including completing Winter Quarter coursework for two courses, petitioning for a late withdrawal from one course; and looking into registering with the Office of Accessible Education, taking courses online, and returning to campus part-time.

62. On March 28, with the support of his care team at La Selva, Jacob submitted an appeal to the leave of absence decision. In it, Jacob explained the progress he had made in treatment, his belief that returning to his hometown in Utah could be more harmful to his mental health, and his request to return with a reduced course load while simultaneously continuing mental health treatment.

63. That same day, Jacob's psychiatrist submitted a corresponding letter of support outlining Jacob's progress with treatment and stating that "[i]t is my opinion that [Jacob] would benefit from returning to Stanford for spring quarter in 2018 with a reduced course load."

64. The next day, March 29, Jacob appeared before a panel of three administrators over Skype. The next week, on April 2, Jacob met with Dean Griffith in person and she told him that the appeal committee had denied his appeal and had recommended a leave.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

65.     On April 5, Jacob met with Dean Griffith in person and she notified him that she had denied his request to enroll in Spring Quarter and was placing him on a mandated leave of absence. She also provided him with a letter with this same information.

66.     In order to return from his current, forced leave of absence and to residential housing, Griffith and Giammalva have informed Jacob by letter that Stanford requires him to provide documentation of his mental health treatment to show that he has "addressed the issues that led to [his] loss of housing privileges," sign a release of medical information to permit Stanford to speak directly with private healthcare providers, submit a personal statement describing his "understanding of why [his] behaviors are of concern," and meet periodically with a Residence Dean. These requirements make no mention of his behaviors being connected to or the result of a disability. Nor do they include any discussion or consideration of possible reasonable accommodations.

67.     Throughout this process, Jacob has felt that Stanford has treated him more as a legal liability than as a student. Stanford has aggravated Jacob's stress with vague, incomplete information and complicated processes which he must navigate without assistance or explanation. Rather than being the supportive community Jacob and his parents were assured Stanford would be when he decided to enroll, Stanford has seemingly disregarded the recommendations of Jacob's treatment providers, barred him from campus and his housing, made him to feel as though he has violated the rules by having a mental health disability, and, in order to return to campus and housing, ordered him to apologize for it.

68.     Due to his experience with Stanford's leave of absence policies, Jacob would be very hesitant to go to a Residence Dean if he were having a hard time. Jacob intends to comply with required meetings with Residence Deans to process his readmission to Stanford but will be very careful about how he speaks and the words he chooses because he is afraid his words would again be taken out of context and used against him as grounds for removal, more burdensome readmission requirements, or threats of legal action.

69.     Jacob also knows several students who, because they know about his or a similar experience with Stanford's leave policies, have told him that they are deterred from using on-campus resources because they are afraid of the repercussions.

**B.     Plaintiff Tina Y.**

70.     Plaintiff Tina Y. was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory leave policies.

71.     Tina Y. is twenty-three years old and has a mental health disability.

72.     At the time of filing the Complaint in this case, Tina was enrolled as a Stanford student. Tina typically lives in Stanford, California during the academic year, but is currently living in Carrabelle, Florida as she is currently on an academic suspension with an anticipated return of Fall Quarter 2019.

73.     Since first enrolling at Stanford in Fall Quarter 2013, Tina has been a leader in several student organizations, including student government and the Mental Health & Wellness Coalition.

74.     In Fall Quarter 2013, her first quarter at Stanford, Tina was diagnosed with posttraumatic stress disorder ("PTSD") after being sexually assaulted by another student.

75.     That Spring Quarter 2014, Tina had engaged in some self-harm behaviors related to the PTSD. Around the time of Admit Weekend 2014, Justin Neiman, a Residence Dean, emailed Tina requesting a meeting and notifying her that she could lose her housing privileges if she did not meet with him. When Tina met with him, Neiman appeared to be aware that she had engaged in self-harm because he stated that he was "not a doctor" and "not trained in these things, but" that "this behavior" made her a "menace to the community" and a "liability," or words to that effect. Neiman asked Tina to avoid being seen by or interacting with admitted students during Admit Weekend. He also warned that she may be forced to take a Dean's Leave of Absence if she continued to impact other students, without specifying who she was impacting or how.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

76.     The following Fall Quarter 2014, Tina took a voluntary leave of absence to focus on her health and returned to Stanford for Spring Quarter 2015. After completing a summer internship in New York, Tina returned to Stanford for Fall Quarter 2015 and served as a mental health leader on campus, including assisting with developing a new campus group to improve student mental health.

77.     In Winter Quarter 2016, Tina suffered a concussion which exacerbated her mental health symptoms. In Spring Quarter 2016, Tina reached out to her psychiatrist and, in consultation with her, agreed to seek treatment at the hospital. After the hospitalization, Tina took a voluntary leave of absence to focus on treatment and ensure she was at her best before studying abroad.

78.     During the summer of 2016, Tina participated in Stanford's overseas studies program in Cape Town, South Africa.

79.     In July of that summer, Tina experienced a PTSD episode and subsequently engaged in non-suicidal self-harm and reached out to her RA for help.

80.     Two days later, on July 29, Trudy Meehan, the Director for Stanford's Cape Town Overseas Studies Program, took Tina to an emergency room to seek a medication adjustment to treat her anxiety symptoms. At the hospital staff's recommendation, Tina went with Meehan went to the Akeso Psychiatric Clinic to see an on-call psychiatrist. After Tina spoke with the on-call doctor, Meehan spoke with the doctor, separately.

81.     Tina did not want to remain at the clinic. Clinic staff initially told her that she could leave. An hour later, Meehan, the Stanford Director, urged her to spend the night in the hospital. When Tina asked what would happen if she did not want to spend the night, Meehan indicated that it could make her eligible for removal from the program. Tina stayed at the clinic.

82.     On or about August 1, Meehan informed Tina that she would remain in the clinic indefinitely, while Meehan and "home campus" (Stanford's administration in California) determined what to do with her; including the possibility of sending her back to the United

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   States. Meehan told Tina that if she refused continued in-patient care, she would be

2   automatically removed from the overseas studies program.

3        83.     On August 3, Tina's fifth day in residential treatment, Dean of Students Chris

4   Griffith and Residence Dean Leigh Thiedeman told her over the phone that they were placing her

5   on a leave of absence. They also told Tina she would need to participate in a thirty-day therapy

6   treatment program as a condition of readmission.

7        84.     Over the phone, Griffith and Thiedeman claimed that Tina was disruptive to her

8   classmates and academic program, and that her needs exceeded the resources the university

9   could provide.

10       85.     The next day, August 4, Tina's psychiatrist informed her that she was comfortable

11  with discharging Tina to two days of outpatient treatment per week and that she did not

12  recommend the thirty-day program.

13       86.     That day, Tina shared this update with Griffith and Thiedeman, and asked if they

14  had spoken with her psychiatrist. They told her that they had not.

15       87.     Tina's attending psychiatrist and supervisor at the Human Rights Media Centre

16  told her that they would write letters to Griffith to express frustration with Stanford's actions and

17  their negative impact on Tina's mental health.

18       88.     At no time during these events did anyone from Stanford discuss with Tina the

19  option of receiving reasonable accommodations that would allow any options other than taking a

20  leave of absence.

21       89.     Tina appealed the leave of absence. Stanford required her to submit a personal

22  statement and participate in a video conference with a panel of administrators.

23       90.     During Tina's three-hour video conference to appeal the leave of absence, the

24  administrators asked her how she would remedy the damage she had done to the community.

25  This assertion seemed misguided to Tina because her community of students had so diligently

26  reached out to her while she was receiving treatment and been very supportive.

27

28

*Mental Health & Wellness Coalition et al. v. The Board of Trustees of the Leland Stanford Junior University*
**Case No.: 5:18-cv-02895-NC**
**Amended Complaint**     **14**

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

91.     Tina's fellow students sent a letter of solidarity in support of her to Stanford. They expressed concern for the well-being of all students, especially those with mental health disabilities, who were at that time or would in the future be enrolled in the overseas studies program. The students asked what Stanford's response to Tina would mean "for anyone in the future who considers reaching out to a staff member for support."

92.     Stanford ultimately granted Tina's appeal and she returned to the program after two weeks. Griffith informed Tina by phone that they conditioned her reintegration into the overseas studies coursework and community upon her participation in a therapy treatment program consisting of three sessions of therapy per week for the remainder of the overseas studies program. Tina had to arrange and pay for transportation to and from the therapy herself.

93.     Throughout this process, Stanford's actions aggravated Tina's symptoms by, for example, diminishing her already low self-esteem and making her feel paranoid and fearful that she could again be excluded when she returned to Stanford in the Fall.

94.     Tina felt like Stanford disregarded her wishes and her doctors' recommendations. Rather than meaningfully conferring with Tina and her doctors, focusing on her health, offering resources, and engaging with her to explore accommodations to enable her to remain in her community; Stanford attempted to require Tina to engage in medical treatment despite her doctors' recommendations, made Tina feel like a liability, and unilaterally acted to force her to accept blame for disability-related behavior and isolate her from her community, while she was thousands of miles away from home.

95.     Based on her experience with Stanford's leave of absence policies, Tina has done her best to lay low for fear of being again excluded. Tina would not reach out to Dean Griffith or Residence Deans as a resource. She has also refrained from calling Stanford's mental health crisis line because doing so requires providing her student identification number and notifies CAPS. Tina does not want to use any of Stanford's on-campus mental health resources for fear that Stanford will use her doing so as justification for excluding her again.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

### C.    **Plaintiff Erik X.**

96.     Plaintiff Erik X. was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory leave policies.

97.     Erik is twenty-four years old and has a mental health disability. He is currently enrolled as a Stanford student and lives in Stanford, California during the academic year.

98.     Since first enrolling at Stanford in Fall Quarter 2012, Erik has been a leader in several student organizations. He maintains a 3.9 grade point average and has been accepted to a Stanford co-terminal master's program, to begin Fall Quarter 2018.

99.     Erik is a member of the Mental Health & Wellness Coalition.

100.    On January 25, 2013, during Winter Quarter, Erik was hospitalized at Stanford Hospital after attempting suicide.

101.    Within twenty-four hours of his admission, Carolus Brown, a Residence Dean, sent Erik a text message stating that if Erik had met with him, this "incident" would not have happened. Brown also texted Erik stating that everyone in Erik's dorm was talking about him.

102.    Brown's messages triggered Erik into an anxiety attack.

103.    While Erik was in the hospital, John Giammalva, another Residence Dean, visited him. After requesting his medical records, Erik later confirmed that Giammalva was visiting him to "inform[] [him]...that [he was] referred to the Dean's Leave of Absence." In addition to speaking with Erik that day about a leave of absence, Giammalva told Erik that he was not allowed on campus while on leave and admonished that, if he violated this term, Erik risked probation or expulsion.

104.    Giammalva also coerced Erik into signing a voluntary leave of absence form. He told Erik that he had not yet been released from the hospital because of his failure to cooperate and sign the form, and that it would be near impossible to return to Stanford without filling out the form.

105.    Erik remained in Stanford Hospital until February 8, at which point the hospital discharged him directly to La Selva, where Erik remained in residential treatment for one month.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

106.    On February 19, while Erik was receiving treatment at La Selva, Brown notified him by letter that Stanford had revoked his on-campus housing. The housing revocation letter cited language from the Dean's Leave of Absence Policy; noting that Stanford was revoking Erik's housing due to his "[inability] or [unwillingness] to carry out substantial self-care obligations," requiring a "level of care…from the university community [that] [exceeded] the resources and staffing" that the university could provide, and "the impact of [his] behavior on our community." The letter included no discussion of possible reasonable accommodations or any acknowledgement of protections for students with disabilities.

107.    Erik wanted to appeal the decision but, in speaking with Residence Deans, they strongly discouraged him from doing so.

108.    By the time La Selva discharged Erik, Stanford had charged his account a $450 housing administrative fee to process the contract termination.

109.    At no time did Stanford staff discuss or engage with Erik in conversations related to accommodations that might allow him to remain a student or remain in his housing.

110.    Erik returned to campus in Fall Quarter 2014. Stanford informed him by letter and email of numerous requirements and conditions on his re-enrollment and return to on-campus housing, including drafting and submitting a personal statement "demonstrat[ing] insight into the impact of [his] behavior on others."

111.    Stanford also informed Erik by email and through meetings with administrators that Stanford required him, in advance of his return, to provide a letter from his treating clinician regarding his readiness to return, release his medical information so that Stanford could speak directly with his treatment professionals, coordinate and participate in numerous meetings with various Stanford staff members and administrators; and, upon return, participate in off-campus mental health treatment multiple days per week, for which Erik had to arrange and pay for transportation. Again, these requirements failed to acknowledge that Erik's past acts were related to a disability, or indicate any consideration of possible disability-based accommodations.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

112.    Throughout this process, Stanford's management of Erik's crisis and subsequent case aggravated Erik's trauma and caused him harm. Rather than focusing on talking with Erik about his health and possible accommodations to enable him to remain at all involved in school and on-campus housing; Stanford made Erik feel like a liability and that he had been stripped of his decision-making power. Erik feels that Stanford forced him to accept blame for actions related to his mental health disability and punished him by excluding him from campus and housing and subjecting him to onerous readmission requirements.

113.    Moving forward, based on his experience with Stanford's leave of absence policies, Erik would never disclose to anyone on campus, particularly a Residence Dean or CAPS, if he were experiencing a heightened level of symptoms or suicidality, because he does not want to again be removed from campus and treated the way he was treated.

114.    In addition to himself, Erik knows of at least fifteen other Stanford students and alumni who have been placed on a leave of absence for a mental health reason over the past five years.

### D.    **Plaintiff Harrison Fowler**

115.    Plaintiff Harrison Fowler was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory leave policies.

116.    Harrison is nineteen years old and has a mental health disability. He is currently on a leave of absence from Stanford.

117.    Harrison first enrolled at Stanford in September 2017 and initially lived in Stanford, California during this past academic year, but is currently residing in Beaumont, Texas.

118.    While on a leave of absence Harrison has been continuing coursework through an independent study of calculus with MIT OpenCourseWare. When Harrison returns to Stanford, he wants to major in mathematics.

119.    In October 2017 Harrison experienced suicidal ideation. Remembering a mental health presentation at Stanford, Harrison got the courage to seek help from CAPS. CAPS recommended hospitalization, so Harrison agreed to admit himself to Stanford Hospital.

120.     Harrison remained at the hospital for three days and then the hospital discharged him to continue outpatient treatment at La Selva. This program was difficult for Harrison as he did not have a car at Stanford and had limited funds, so he ran there and back from campus—three miles each way. However, Harrison diligently did what he was told to do.

121.     Harrison also took an anti-depressant as prescribed to him by a psychiatrist at La Selva. This medication had a side effect of suicidal ideation, and Harrison began to experience the worst suicidal ideation he had ever had.

122.     On November 6, after having suicidal thoughts, Harrison reached out to a friend for help. The friend recommended Harrison speak with his RA, so he did. When Harrison spoke with his RA, they called CAPS. Harrison told CAPS that he was feeling suicidal and CAPS called the police; who came to his dorm, handcuffed him, and took him to Stanford Hospital, where Harrison was again admitted.

123.     While Harrison was in the hospital, Residence Dean Carolus Brown visited him to talk about a leave of absence, telling Harrison that he was most likely going to have to take a year off. Harrison tried to explain that it was not necessary, that he had been on the wrong prescription, and that it was not good for him to go to Beaumont, where he is from.

124.     Brown told Harrison that the decision was not his or Harrison's to make, and that Brown had to speak with higher-level administrators. Brown never provided Harrison with an update.

125.     On November 11 or 12, at a meeting at the hospital to discuss his discharge plan, Brown and Tanisha Clarke from CAPS stated to the hospital's doctors, in front of Harrison, that Harrison was going to take a year off. This was the first time Harrison learned explicitly that he was going to be on a leave of absence. At that point, Harrison had not yet signed the leave of absence form.

126.     Harrison did not want to take a leave of absence but signed the leave of absence form because Stanford presented it as the only option and he did not know that he had any choice or right to protest. Brown and Clarke's discussion of the leave of absence in Harrison's discharge

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   meeting made it seem to Harrison that his entire discharge plan was contingent on him taking a

2   leave of absence and that he would not be discharged without it.

3       127.   At no time did Stanford staff discuss or engage with Harrison in conversations

4   related to accommodations or any other options that might allow him to remain a student or

5   remain in his housing.

6       128.   The hospital discharged Harrison on November 13, and he spent the night with his

7   parents in Stanford's visiting-family housing.

8       129.   Harrison's mother packed up and moved his things out of his room for him.

9       130.   The next day, November 14, Harrison signed the leave of absence form, said

10  goodbye to his friends, and returned to Texas with his parents.

11      131.   In order to return from his current leave of absence and to residential housing,

12  Dean of Students Chris Griffith has informed Harrison by letter that he must provide

13  documentation of engagement in professional treatment and allow CAPS to speak directly with

14  his healthcare providers, in addition to meeting periodically with a Residence Dean.

15      132.   Griffith's letter also informed Harrison that he must submit a personal statement

16  discussing "[his] understanding of why [his] behaviors are of concern," as well as what led to his

17  suicidal ideation and what changes Harrison will make. This requirement has made Harrison feel

18  blamed for his problems and that he has been classified as a hindrance to everyone else.

19  Additionally, these requirements make no mention of Harrison's behaviors being connected to or

20  the result of a disability. Nor do they include any discussion of possible reasonable

21  accommodations.

22      133.   After the start of Harrison's leave, Associate Dean Edith Wu emailed him

23  resources available to him for after he returns to Stanford. Wu has made no mention of

24  reasonable accommodations available to Harrison regarding requirements for his return from

25  leave.

26      134.   Based on his experience, Harrison has no plan to use campus resources, including

27  Residence Deans and CAPS, when he returns to Stanford. Given that Stanford requires Harrison

28

1   to engage in treatment upon his return, Harrison will have to seek treatment off-campus. The

2   implications of the consequences of reaching out to campus resources—being isolated from

3   Stanford and falling an entire year behind in his studies and career plans—are too severe.

4       **E.      Plaintiff Rose A.**

5       135.    Plaintiff Rose A. was harmed and faces the ongoing possibility of being harmed

6   in the future by Stanford's discriminatory leave policies.

7       136.    Rose is nineteen years old and has a mental health disability. She is currently on a

8   leave of absence from Stanford.

9       137.    Rose first enrolled at Stanford in September 2017 and initially lived in Stanford,

10  California during this past academic year, but is currently residing in Melbourne, Australia.

11      138.    While on a leave of absence Rose has completed coursework at a local university

12  in Melbourne and maintained three volunteer positions within her local community.

13      139.    In Fall Quarter 2017, Rose experienced suicidal ideation and engaged in non-

14  suicidal self-harm.

15      140.    Rose called CAPS and participated in a brief intake interview, after which CAPS

16  sent her a message on October 10 through Vaden Health Center with referrals for off-campus

17  providers. Rose promptly called and left messages with several providers. Only one provider

18  called her back, and gave her an appointment for October 24. By then, Rose was in the hospital.

19      141.    On or about October 20, Rose experienced suicidal ideation, opened up to her RA,

20  and agreed to go with her RA to Stanford Hospital for mental health treatment.

21      142.    At the hospital, hospital staff directed Rose to spend the night in the hallway of

22  the Emergency Room with earplugs and an eye mask, while waiting for a bed to become

23  available.

24      143.    The next day, Stanford Hospital told Rose that they were transferring her to San

25  Jose Behavioral Health Hospital because Stanford Hospital did not have any beds available.

26      144.    On October 22, her second day at San Jose Behavioral Health, Residence Dean

27  Carolus Brown called and told Rose that she would have to leave school for a year through the

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

Dean's Leave of Absence Policy. He also told Rose that she would have to improve her behavior in order to improve the outcome.

145.     When Rose began crying at this news, Brown accused her of sounding hysterical and attempting to manipulate him. He also told Rose that she had disturbed the atmosphere of her dormitory and that everyone had been worried about her. This conversation upset Rose deeply by making her feel like she had been toxic, at a time when she was already feeling vulnerable and experiencing negative self-worth.

146.     At no time did Stanford staff discuss or engage with Rose in conversations related to accommodations that might allow her to remain a student or remain in her housing.

147.     Rose begged Brown to let her stay enrolled. She offered to reduce her course load and engage in any form of therapy. She was willing to do anything. Brown said that Rose was being emotional and that if she continued on, he would have to put her on a leave of absence.

148.     When Rose tried to explain what had happened prior to her hospitalization and why she did not want to leave school for a year, Brown told her that he did not care what had happened. He said something to the effect of "it's too late now."

149.     Brown also informed Rose by phone that he barred her from returning to her dormitory and all of school grounds, with the exception of meeting with him and Tanisha Clarke, from CAPS.

150.     In part because of Stanford's excluding Rose from returning to her housing, she had to stay in the hospital longer. Rose had no living accommodations until her parents arrived—at incredible cost—from their last-minute flight to California from Australia.

151.     On her fifth day at the hospital, Rose had a legal hearing about the hospital extending her hold. At that hearing, the hospital's representative read aloud from a document that he said contained notes from the hospital's psychiatrist stating that Stanford had requested that Rose take a leave of absence under threat of expulsion. Referencing this document, the hospital's representative said that because Rose did not have any housing accommodations she should remain on a hold in the hospital.

152.    Rose remained at San Jose Behavioral Health until October 31, at which point she was discharged.

153.    Shortly after her discharge, Rose met in person with Clarke and they conferenced in Brown by phone. During that meeting, Brown accused Rose of distressing other students. When Rose asked him how, he deflected her question.

154.    Brown's accusation that Rose had harmed others around her was traumatic to her and, for a while, made her extremely anxious and fearful to interact with others. When Rose finally re-connected with her friends, they assured her that nothing about her behavior was as Brown had described. Multiple friends even offered to write to Stanford's administration in support of her, but Rose felt it would not be any use and so told them not to.

155.    Rose signed the leave of absence form shortly after her discharge from the hospital because she believed that if she did not, she would be expelled.

156.    In an email, Dean of Students Chris Griffith stated that the leave of absence had been "put in place" because Rose had been "increasingly dependent" on other students to manage her mental health and unwilling to seek help from mental health providers. In fact, as explained above, Rose had reached out to CAPS and was still waiting for her off-campus appointment with one of the mental health providers they referred her to when she voluntarily admitted herself to Stanford Hospital.

157.    Rose's parents had to move her out of her dorm room because Stanford had banned her from campus. Rose's RA successfully petitioned Stanford to allow her a half hour to say farewell to her dorm mates, on the condition that Brown supervise the visit.

158.    Once Rose returned to Australia, her treatment provider prescribed about three and a half hours of Dialectical Behavior Therapy per week, in which she is successfully engaged. Rose feels she could have managed this treatment along with coursework at Stanford.

159.    In order to return from her current leave of absence, Dean Griffith and Tanisha Clarke informed Rose by email that Stanford requires Rose to allow Stanford to speak directly with her private treatment providers, provide documentation of ongoing treatment, and

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  participate in multiple meetings with Stanford administrators, as well as provide a personal

2  statement that describes "[her] understanding of why [her] behaviors are of concern" and "the

3  ways in which [Rose] h[as] been addressing the issues that prompted her referral [to a leave of

4  absence]." Griffith also notified Rose by email that she requires Rose to meet periodically with a

5  Residence Dean upon her return.

6      160.    In addition to these requirements, Stanford set separate requirements to lift Rose's

7  housing hold. Brown initially informed Rose by email that he required her to draft a statement in

8  which she "share[s] more about the impact [she] had on the community" and how "[her] ability

9  to care for [her]self was somewhat limited," as well as answer twelve follow-up questions

10  regarding these topics.

11      161.    On May 18, the day after the initial complaint in this lawsuit was filed, Rose

12  received another email from Brown, in which he "apologize[d] for any confusion" regarding how

13  "[his] requests may have been a little unclear," and lifted her housing hold. He said he would

14  now "like for [Rose] to share in a one-page reflection an answer to this simple question: What

15  does success look like upon your return to the campus community?"

16      162.    On May 26, Dean Griffith notified Rose by email that she no longer needed to

17  submit any personal statement to Brown and that her personal statement to Griffith would suffice

18  for both the leave of absence and housing hold processes.

19      163.    Rose's psychiatrist and therapist have written letters to Stanford supporting her

20  readmission. Rose's psychiatrist has stated to her in person that he thinks there was not a need

21  for Rose to be on a leave of absence.

22      164.    As a result of her experience with Stanford's leave of absence policies, Rose is

23  terrified of seeking on-campus resources and very concerned that, if she does, she will be put on

24  a leave of absence again. Rose's psychiatrist showed her the letter he wrote to Stanford to

25  support her readmission, in which he recommends Rose not use campus mental health resources

26  because her experience with them has been traumatic. In addition to no longer feeling safe using

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   CAPS, Rose would not go to a Residence Dean if she were having a hard time because she does

2   not want to be again insulted, told that she is a burden, and blamed for being ill.

3       165.    Enrolling at Stanford was Rose's first time in America. Being told that she had

4   done something wrong and negatively impacted others was traumatic—Rose felt so guilty and it

5   made her feel horrible about herself and afraid to reach out to any of her friends. Moving

6   forward, Rose plans to go off campus for treatment, even if it takes more time and costs more.

7       **F.**    **Plaintiff Sofia B.**

8       166.    Plaintiff Sofia B. was harmed and faces the ongoing possibility of being harmed

9   in the future by Stanford's discriminatory leave policies.

10       167.    Sofia is twenty-one years old and has a mental health disability. She is currently

11   enrolled as a Stanford student and resides in Stanford, California during the academic year.

12       168.    Since first enrolling at Stanford in Fall Quarter 2015, Sofia has founded and been

13   involved with several extracurricular organizations on campus, in addition to conducting

14   research with various professors and completing internships off campus.

15       169.    During finals week in Fall Quarter 2015, Sofia experienced an anxiety attack and

16   spoke with her Resident Fellows, Alana Connor and Howard Rose. At their recommendation,

17   Sofia voluntarily admitted herself to Stanford Hospital on December 6, 2015, where she

18   remained until December 9.

19       170.    Dean of Students Chris Griffith visited Sofia in the hospital and told her that she

20   had to take a leave of absence because she had placed too much stress on staff and been

21   disruptive to other students. Sofia told Griffith that she has an abusive family and going home

22   would be detrimental to her mental health.

23       171.    Stanford presented no options other than a leave of absence and did not engage

24   with Sofia in conversations related to disability-based accommodations that might allow her to

25   remain a student or remain in her housing.

26       172.    Sofia did not want to take a leave of absence, but signed the leave of absence

27   form because she thought she had no other choice. Sofia decided to do what Stanford told her to

28

*Mental Health & Wellness Coalition et al. v. The Board of Trustees of the Leland Stanford Junior University*
Case No.: 5:18-cv-02895-NC
**Amended Complaint**    25

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   do so that her parents would not accumulate unnecessary tuition costs and she could return to her

2   studies as soon as possible.

3       173.   Sofia moved her things out of her dormitory and Stanford charged her account a

4   $350 "Late Termination of Occupancy" fee.

5       174.   Sofia lived with her parents during Winter Quarter 2016, during which they

6   would not speak to her. When anyone dropped by the house and asked why Sofia was there, her

7   parents said that Sofia was just visiting. Sofia felt like, in her parents' eyes, the only good thing

8   she had ever done had been rescinded.

9       175.   Sofia tried to raise her spirits by visiting friends on campus but Stanford

10  administrators told her by email that Sofia could only be there for a couple of hours because she

11  was not supposed to be on campus during a leave of absence.

12      176.   Sofia returned to campus in Spring Quarter 2016. Griffith informed her by phone

13  of numerous requirements on her re-enrollment and return to on-campus housing; including

14  demonstrating that she had engaged in mental health treatment, submitting a letter from her

15  doctor detailing her diagnosis and treatment, and drafting a personal statement accepting blame

16  and apologizing. Again, these requirements failed to acknowledge that Sofia's past thoughts and

17  acts were related to a disability, or any mention of possible disability-based accommodations.

18      177.   When Sofia went on leave, Stanford did not allow her to take the final exams that

19  had been proctored while she was in the hospital and required her to take incompletes on all her

20  classes. Sofia had been earning high grades in those courses up until her hospitalization. When

21  she returned to Stanford a year later and Stanford finally allowed her to sit for those final exams,

22  the courses had different professors and different materials and Stanford made Sofia take the new

23  exams. Her grades suffered.

24      178.   Sofia has been taking on a large course load in addition to working so that she can

25  pay her bills and graduate in four years, to avoid incurring additional academic costs and raising

26  suspicion among prospective employers.

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

179.    Sofia is also not applying to jobs that require a transcript because she does not want a prospective employer to see that she was not enrolled in Winter Quarter 2016 and decide to not hire her because she took a leave of absence.

180.    Throughout her leave of absence experience, Stanford made Sofia feel like a liability. Sofia felt that Stanford forced her to accept blame for actions related to her mental health disability; rather than considering her specific circumstances, listening to her about the harm that going home would cause her, and engaging with her about any options other than full exclusion.

181.    After her experience with Stanford's leave of absence policies, Sofia felt like if she did anything that Stanford perceived to be out of line with their strict mental health policies that she would be removed from campus. Sofia has not been back to CAPS and has told other students to not tell anyone in authority about their mental health struggles because the administration will remove the student if they perceive their mental health to be a liability. Sofia has not had any other interactions with Residence Deans or Dean Griffith since Stanford placed her on a leave of absence. She tries to stay very quiet now.

### G.    Student Erica C.

182.    Erica C. is a Stanford student who was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory leave policies.

183.    Erica is twenty years old and has a mental health disability. She is currently enrolled as a Stanford student and lives in Stanford, California during the academic year.

184.    Since first enrolling at Stanford in Fall Quarter 2016, Erica has contributed to several student organizations, while maintaining above a 3.6 grade point average.

185.    On February 7, 2017, during Winter Quarter, Erica was hospitalized at Langley Porter Psychiatric Hospital after attempting suicide in San Francisco.

186.    The next morning, a social worker at the hospital informed Erica that, at her request, she had called the front desk of Erica's dormitory to inform Stanford of where she was.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

187.   On February 12, Langley Porter discharged Erica and she returned to Stanford.

188.   The next day, Erica met in person with Residence Dean Leigh Thiedeman, at Thiedeman's request. In this meeting, Thiedeman told Erica to tell her exactly what had happened. When Erica declined to do so, Thiedeman told her that she could not move forward with determining whether Erica could return to her dorm until Erica provided her with her medical records.

189.   While they waited for Erica's medical records to arrive from the hospital, Thiedeman required Erica to stay in Lasuen, a Residential Education administrative office that has rooms for students who have been kicked out of housing.

190.   Erica stayed at Lasuen for nearly one week, until February 17, when her medical records arrived. That day, she met with Thiedeman, a psychiatrist from CAPS, and a CAPS social worker. The psychiatrist told Erica that she had to go to the hospital immediately or they would force a leave of absence on her.

191.   That day, Erica admitted herself to inpatient treatment at Stanford Hospital, where she was diagnosed with a mental health disability.

192.   Four days later, on February 21, Thiedeman visited Erica at the hospital and told her that Stanford was placing her on a leave of absence. Erica was so upset by this news that she got sick, nearly passed out, and became actively suicidal, which led to her being involuntarily held at the hospital.

193.   Shortly thereafter, Dean of Students Chris Griffith visited Erica in the hospital and gave her a letter regarding her being placed on a leave of absence as well as a housing hold. The letter outlined Griffith's "concerns," or things Erica had done wrong, and mentioned the impact Erica had had on the community. The letter also stated that Erica was not allowed on campus or to participate in any Stanford-related projects or organizations during the leave of absence. The letter included no discussion of possible reasonable accommodations or any acknowledgement of protections for students with disabilities.

1    194.    Griffith also brought with her a leave of absence form, which Erica signed

2    because she believed, based on Griffith's statements, that Stanford was going to impose the leave

3    of absence anyway.

4    195.    Erica considered appealing the decision but did not because she was exhausted

5    from dealing with Stanford and understood that Stanford would not grant her appeal.

6    196.    Stanford Hospital discharged Erica on March 6.

7    197.    Erica's family lives in Korea. Her mother arrived and packed up her things from

8    her dorm room while Erica was in the hospital. Erica and her mother stayed at an AirBnB in Palo

9    Alto for two days to settle paperwork and then Erica returned to Korea with her mother.

10    198.    At no time did Stanford staff discuss or engage in conversations with Erica related

11    to accommodations that might allow her to remain a student or remain in her housing.

12    199.    Erica returned to campus in Fall Quarter 2017. Dean Griffith notified Erica in

13    person and a CAPS social worker notified her by email of a number of requirements and

14    conditions on her re-enrollment and return to on-campus housing. They included demonstrating

15    mental health treatment, providing a letter from her doctor, participating in a phone interview

16    with CAPS staff, and submitting a personal statement. Erica understood Stanford to be asking

17    her to apologize for everything she had done in February and to address how she had fixed her

18    behavior. These requirements failed to acknowledge that her past acts were related to a disability,

19    or include any offer of possible disability-based accommodations.

20    200.    While Erica was on a leave of absence, she had serious doubts about returning to

21    Stanford because of how she was treated during the leave of absence process. It took her a while

22    to separate in her mind the administration from students and faculty.

23    201.    When Erica returned to Stanford, she enrolled in an intensive outpatient program

24    at La Selva, and found a private therapist in Menlo Park.

25    202.    Erica has since gone to CAPS once to refill a prescription but otherwise does not

26    use university mental health resources because of her past experience and knowledge of the

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   potential consequences such as an involuntary leave of absence and an onerous reenrollment

2   procedure. For the same reasons, she would not reach out to a Residence Dean for help.

3   **H.   Student Alex D.**

4   203.   Alex D. is a Stanford student who was harmed and faces the ongoing possibility

5   of being harmed in the future by Stanford's discriminatory leave policies.

6   204.   Alex is twenty-one years old. She has chronic illness and a mental health

7   disability. Alex recently completed her eleventh quarter as a Stanford student. She lives in

8   Stanford, California during the academic year.

9   205.   Since first enrolling at Stanford in Fall 2014, Alex has contributed to several

10   Stanford student organizations as well as held research and teacher assistant positions, while

11   maintaining above a 4.0 grade point average.

12   206.   Alex is a member of Power2ACT, an organizational member of the Mental Health

13   & Wellness Coalition.

14   207.   At the end of Winter Quarter 2017 Alex experienced declined mental and physical

15   health and realized she would not be able to continue on a full courseload.

16   208.   Alex reached out to CAPS, her Academic Director, and her Office of Accessible

17   Education Advisor about petitioning to take a reduced course load due to her disabilities.

18   209.   Every Stanford staff member Alex spoke with encouraged her to take a leave of

19   absence, rather than work with her on academic accommodations to stay on campus. Based on

20   their statements, it seemed to Alex like a leave of absence was the only option.

21   210.   As a result, Alex was forced to take a full leave of absence three weeks into the

22   ten-week-long Spring Quarter 2017.

23   211.   While Alex was on leave, she took two final exams and earned A grades on each.

24   212.   On her return to campus in Fall Quarter 2017, Alex did not receive her requested

25   housing accommodations.

26   213.   Alex has observed over the past several years that if a Stanford student is

27   involuntarily hospitalized for mental health treatment they effectively disappear from campus.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

214.    Alex has at least one friend who told her they were placed on an involuntary leave of absence for mental health reasons, at least two friends who told her they were encouraged or coerced into taking voluntary leaves of absence for mental health reasons, and at least one other friend who told her Stanford required them to engage in a specific treatment program to return to campus from a leave of absence for mental health reasons. In each instance, Alex observed that her friends disappeared from campus. She only found out after speaking with them later where they had gone.

215.    Because of Alex's and her friends' experiences, Alex has warned friends in mental health crisis that she believes going to CAPS carries the risk of exclusion from campus.

216.    In Alex's time at Stanford, at least five friends have told her they were afraid of going to CAPS because they feared being kicked out of school and the dorms. Two of these friends are transgender and are especially fearful of Stanford sending them to homes that are not safe for them.

217.    As a member of Power2ACT, Alex has participated in discussions about how people with disabilities have higher instances of mental health struggles. Alex and other members of Power2ACT have also discussed how to respond to students who open up to them regarding mental health struggles and who need help. In these conversations, they have noted the risks of going to CAPS or to Residence Deans known to be unsympathetic and harmful. Accordingly, Power2ACT is drafting a section on leave of absence in a resource document it is creating to serve as an unofficial guide to disability at Stanford.

218.    Because of Alex's and her friends' experiences with Stanford's leave of absence policies and practices, Alex feels like CAPS is not a resource to help her as a student because it maintains policies that appear to function as a pipeline to help Stanford remove students with mental health disabilities from campus.

### I.    Student Grace E.

219.    Grace E. is a Stanford student who was harmed and faces the ongoing possibility of being harmed in the future by Stanford's discriminatory leave policies.

---

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

220.   Grace is eighteen years old and has a mental health disability. She is currently enrolled as a Stanford student and lives in Stanford, California during the academic year.

221.   Since first enrolling at Stanford in Fall 2017, Grace has participated in several extracurricular activities on campus.

222.   Although Grace has not been placed on a leave of absence as a Stanford student, she has been deterred from using campus resources for fear of being so excluded.

223.   In Summer 2016, the summer before her senior year of high school, Grace participated in Stanford's High School Summer College program, a residential and academic program for selected high school students.

224.   During the program, Grace disclosed suicidal ideation and a history of self-harm that stemmed from her mental health disability to CAPS and to a Stanford administrator.

225.   Grace went to Stanford Hospital for a brief psychiatric evaluation and the doctor at the hospital cleared her for discharge because, the doctor said to her and a Stanford administrator, Grace was not a threat to herself.

226.   The next morning, Grace received an email from a Stanford administrator notifying her that Stanford was barring her from continuing to live in the residence halls and excluding her from the dormitories and dining halls. Grace had to complete her summer classes by commuting to Stanford from her parents' hotel room in San Francisco.

227.   Grace enrolled at Stanford in Fall 2017 after gaining admission through Stanford's Restrictive Early Action program. Grace decided to attend Stanford even after the experience she had had two summers prior because of the academic and other programs Stanford offers.

228.   However, Grace has not returned to CAPS for mental health treatment as a Stanford student. She is afraid to go to CAPS because she fears being forced out again.

229.   This past year, Grace was a freshman. At Stanford, freshmen must live on campus to go to classes, so Grace knew she would lose her student status if Stanford removed her from housing again. Though it has meant going without treatment for the past year because Grace has

1   not yet found an affordable out-of-pocket option, she is still too afraid to go to CAPS because

2   being sent home would be worse for her mental health.

3       **J.       Plaintiff Mental Health & Wellness Coalition**

4       230.    Plaintiff Mental Health & Wellness Coalition ("the Coalition") is a membership

5   organization made up of nearly twenty student groups that focuses on student mental health and

6   wellness by raising awareness, sharing resources, and participating in long-term planning for

7   larger-scale efforts to improve mental health and wellness at Stanford.

8       231.    The Coalition is a space where any Stanford-affiliated person or group interested

9   in mental health, mental illness, and wellness can come together to open lines of communication

10  and collaborate for long term-projects.

11      232.    As outlined in the Coalition's mission statement, the Coalition envisions a

12  Stanford campus:

13          a)      Where students have consistent access to high-quality mental health and

14                  wellness resources;

15          b)      Free of stigma surrounding mental health and illness, with a campus

16                  culture that supports people tending to all forms of mental health needs;

17          c)      Where Stanford administration actively prioritizes and invests in the

18                  health of all members of the Stanford community, through educational

19                  initiatives, funding, accommodations, and open collaboration with

20                  students; and

21          d)      Where everyone is able to succeed and flourish.

22      233.    The Coalition has done significant work to identify the mental health needs of the

23  student body, raise awareness, and coordinate Stanford student mental health and wellness

24  resources to address those needs.

25      234.    The Coalition puts on an annual "Wellness Week," a week of events for students

26  to raise awareness of a broad perspective of mental health and wellness. Events have included

27  presenting on-campus mental health resources; peer support groups; self-care techniques such as

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  yoga and journaling; suicide prevention training; and stigma-reduction such as movie screenings,

2  open drop-in counseling hours, and "Take Back the Stigma." They are currently re-working this

3  program to focus more on creating a space to discuss more serious mental health concerns, such

4  as healing from trauma and addressing stigma surrounding suicide and suicidal ideation.

5       235.    Stanford's discriminatory leave policies frustrate the Coalition's mission of

6  creating a campus free of stigma surrounding mental health and illness, with a campus culture

7  that supports people tending to all forms of mental health needs.

8       236.    Stanford's discriminatory leave policies also frustrate some of the Coalition's

9  member group missions, to the extent those groups seek to connect students with on-campus

10  resources that students are afraid to utilize for fear of being placed on a leave of absence.

11      237.    The Coalition and some of its member groups have expended time and resources

12  to remedy the damage Stanford has done to the community as a result of its discriminatory leave

13  policies and to advocate on behalf of Stanford students and their mental health.

14      238.    The Coalition has developed and presented comprehensive mental health and

15  wellness trainings to Stanford Residential Education staff; including an overview of mental

16  health disabilities, how staff can support students experiencing mental health disabilities, and

17  how to navigate non-crisis situations such as speaking with students experiencing prolonged

18  suicidal ideation or showing warning signs of harming themselves.

19      239.    The Coalition developed these trainings to help Resident Assistants ("RA's")

20  better support their residents. RA's told the Coalition that they had been seeing more student

21  mental health concerns because students have been going to them instead of to CAPS or a

22  Residence Dean, for fear of being excluded from campus.

23      240.    The Coalition has also advocated for administrative changes to create a campus

24  culture with reduced stigma around mental health and more on-campus resources available to

25  students; such as seeking a required course to teach students wellness practices, a more diverse

26  counseling center to reflect the Stanford student community, and additional mental health

27  training for Stanford staff.

28

241.    The Coalition includes members who are Stanford students subject to Stanford's discriminatory leave policies; including students with lived experience with mental health disabilities, suicidal ideation, suicide attempts, involuntary hospitalization for mental health treatment, and past leaves of absence and housing revocations.

242.    Numerous members of the Coalition and the Coalition's organizational members, including Erik X., Tina Y., and Alex D., are students with mental health disabilities who have been excluded from Stanford's programs and services through the implementation of Stanford's discriminatory leave policies and risk being excluded through them again in the future.

243.    Additionally, numerous members of the Coalition and the Coalition's organizational members, including Erik X., Tina Y., and Alex D., are students with mental health disabilities who have been deterred from fully participating in Stanford's programs and services, including counseling services, because they are aware of these discriminatory leave policies and fear being subjected to them.

## CLASS ALLEGATIONS

244.    Plaintiffs' and other students' experiences are examples of an ongoing, systemic pattern of Stanford discriminating against students with mental health disabilities.

245.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the Named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf and on behalf of all putative class members. Plaintiffs do not seek money damages. The class that the Named Plaintiffs seek to represent is composed of all Stanford students who have a mental health disability and have been or will be subject to Stanford's policies and practices regarding students at risk of self-harm, including students who have been deterred from participating in the programs and services Stanford makes available to its students because they are aware of these policies and practices and fear being subjected to them.

246.    Each Plaintiff and member of the proposed class is a "qualified person with a disability" and/or person with "a disability" pursuant to federal and state anti-discrimination laws, as alleged herein.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

247.    The persons in the class are so numerous that joinder of all such persons is impractical and the disposition of their claims in a class action is a benefit to the parties and to the Court.

248.    While the exact number of class members is unknown to Plaintiffs at this time, the proposed class far exceeds forty members. Stanford had 7,032 enrolled undergraduate students and 9,304 enrolled graduate students in the 2016–17 academic year. A 2014 Stanford Daily Survey found that, from more than 500 Stanford student respondents, thirty-one percent had experienced depression while at Stanford and fifty-one percent spent most of their time at a stress level of seven or eight out of ten. Additionally, a 2015 ASSU Mental Health Survey found that, from 1,687 Stanford student respondents, eighty-three percent desired more resources to deal with stress, and seventy-nine percent desired more resources to deal with depression/anxiety.

249.    There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that they are Stanford students who have been harmed and excluded from Stanford's academic, housing, and related services, through its discriminatory leave policies.

250.    Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that Stanford's campus-wide policies and practices regarding students at risk of self-harm violate state and federal disability and fair housing laws; and whether Stanford's failure, as a matter of practice, to engage in an interactive process with students with mental health disabilities at risk of self-harm to discuss possible reasonable accommodations that might allow such students to remain on campus and in student housing also violates federal and state law.

251.    The claims of the Named Plaintiffs are typical of the claims of the class as a whole. Named Plaintiffs have been excluded from Stanford's programs, services, and housing because of the policies and practices at issue for the proposed class, and Named Plaintiffs continue to be subject to those policies and practices. Also, similar to members of the proposed

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  class, Named Plaintiffs are deterred from using Stanford's programs and services for fear of

2  being subjected to that exclusion.

3       252.   Additionally, the Named Plaintiffs are adequate class representatives. They seek

4  the same relief as members of the proposed class (e.g., injunctive and declaratory relief to

5  address the discriminatory leave policies regarding students at risk of self-harm), and their

6  interests are not antagonistic to, nor in conflict with, the interests of the class as a whole.

7       253.   The attorneys representing the class are experienced in disability law and in class

8  action institutional reform litigation. Plaintiffs' counsel is qualified to fully prosecute this

9  litigation and possesses adequate resources to see this matter through to a resolution.

10       254.   Stanford has acted and/or failed to act on grounds generally applicable to the class

11  as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the

12  class as a whole.

### **FIRST CAUSE OF ACTION**

### **Violation of Title III of the Americans with Disabilities Act**

### **42 U.S.C. § 12182, *et seq.***

16       255.   Plaintiffs incorporate by reference the foregoing allegations as if set forth fully

17  herein.

18       256.   Title III of the Americans with Disabilities Act ("ADA") and its implementing

19  regulations entitle individuals with disabilities to the full and equal enjoyment of the goods,

20  services, facilities, privileges, advantages, or accommodations of any place of public

21  accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

22       257.   At all times relevant to this action, Named Plaintiffs and members of the proposed

23  class were and are enrolled Stanford students who have a disability, were regarded as having a

24  disability, or have a record of a disability, and thus were and are qualified individuals with

25  disabilities within the meaning of the ADA. 42 U.S.C. § 12102.

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

258.   At all times relevant to this action, Stanford has been and is a "place of public accommodation" within the meaning of Title III of the ADA, as an undergraduate or postgraduate school, or other place of education. 42 U.S.C. § 12181(7)(J).

259.   Title III prohibits public accommodations from denying or affording an unequal opportunity to an individual or class of individuals with disabilities, on the basis of a disability, the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity or otherwise discriminating against them on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

260.   Title III provides that goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual. 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

261.   Title III provides that an individual or entity shall not utilize standards or criteria or methods of administration that screen out, tend to screen out, or have the effect of discriminating on the basis of disability such that persons with disabilities cannot fully and equally enjoy any goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. §§ 12182(b)(1)(D)(i), 12182(b)(2)(A)(i); 28 C.F.R. §§ 36.204, 36.301(a).

262.   Title III further defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

263.   Regulations implementing Title III prohibit public accommodations from imposing a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as reasonable modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required under the ADA and its implementing regulations. 28 C.F.R. § 36.301(c).

264.   Stanford has violated Title III of the ADA by denying Named Plaintiffs and members of the proposed class, on the basis of disability, the opportunity to fully and equally enjoy, participate in, and benefit from Stanford's goods, services, facilities, privileges, advantages, and accommodations.

265.   Stanford has violated Title III of the ADA by maintaining and executing policies and practices that utilize criteria and methods of administration that have the effect of discriminating against students with mental health disabilities by tending to screen them out of— and make it more onerous for them to regain access to—campus services, facilities, privileges, advantages, and accommodations, on the basis of disability.

266.   Stanford has violated Title III of the ADA by failing to make reasonable modifications to its policies and practices to ensure that Named Plaintiffs and members of the proposed class have equal access to the benefits of Stanford's goods, services, facilities, privileges, advantages, and accommodations.

267.   Stanford has violated Title III of the ADA by failing to provide Named Plaintiffs and members of the proposed class goods, services, facilities, privileges, advantages, and accommodations in the most integrated setting appropriate to their needs.

268.   Stanford's conduct constitutes ongoing and continuous violations of the ADA, and unless restrained from doing so, Stanford will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries for which Named Plaintiffs and members of the proposed class have no adequate remedy at law. Consequently, Named Plaintiffs and members of the proposed class are entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188(a)), as well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

269.   WHEREFORE, Named Plaintiffs and members of the proposed class request relief as set forth below.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973

### 29 U.S.C. § 794, *et seq.*

270.     Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

271.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

272.     As individuals with mental health disabilities or who have a record thereof or who have been regarded as having a disability, Named Plaintiffs and members of the proposed class are persons with disabilities within the meaning of Section 504. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20). As admitted and current students, Named Plaintiffs and members of the proposed class are otherwise qualified to participate in Stanford's services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

273.     As a university, Stanford's operations are qualified programs or activities within the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.41. As an educational institution which permits students to pay education-related costs with the assistance of Federal grants and loans, and has done so at all times relevant to the claims asserted in this Complaint, Stanford is a recipient of Federal financial assistance sufficient to invoke Section 504 coverage. 34 C.F.R. § 104.3(h).

274.     Section 504 implementing regulations promulgated by the Department of Education ("DOE regulations") provide that recipients of Federal financial assistance, in providing any aid, benefit, or service, may not, on the basis of disability, discriminate against an otherwise qualified person with a disability by providing them with an opportunity to participate

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1   in or benefit from the aid, benefit, or service that is different, separate, not equal, or not as

2   effective as that which is afforded others. 34 C.F.R. § 104.4(b)(1)(i)–(iv).

3       275.    DOE regulations further prohibit recipients of Federal financial assistance from

4   limiting a qualified individual with a disability in the enjoyment of any right, privilege,

5   advantage, or opportunity enjoyed by others receiving any aid, benefit, or service. 34 C.F.R.

6   § 104.4(b)(1)(vii).

7       276.    DOE regulations prohibit recipients of Federal financial assistance from utilizing

8   criteria or methods of administration, including within its admission policies, that have an

9   adverse effect on persons with disabilities, or that have the purpose or effect of defeating or

10  substantially impairing accomplishment of the recipient's program or activity objectives with

11  respect to qualified persons with disabilities. 34 C.F.R. §§ 104.4(b)(4), 104.42(b)(2).

12      277.    DOE regulations provide that no qualified student with a disability shall, on the

13  basis of disability, be excluded from participation in, be denied the benefits of, or otherwise be

14  subjected to discrimination under any academic, research, housing, health insurance, counseling,

15  financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid,

16  benefits, or services. 34 C.F.R. § 104.43(a). *See also* 34 C.F.R. §§ 104.43(c), 104.52(a)(1).

17      278.    DOE regulations require covered entities to operate their program or activity in

18  the most integrated setting appropriate. 34 C.F.R. § 104.43(d).

19      279.    Stanford has violated Section 504 by denying Named Plaintiffs and members of

20  the proposed class the benefits of their programs, services, and activities on the basis of

21  disability.

22      280.    Stanford has violated Section 504 by maintaining rules, including eligibility

23  criteria and methods of administration, that have the effect of discriminating against students

24  with mental health disabilities by tending to screen them out of maintaining student status and

25  access to campus resources, including housing, on the basis of disability.

26      281.    As a proximate result of Stanford's violations of Section 504 of the Rehabilitation

27  Act, Named Plaintiffs and members of the proposed class have been injured as set forth herein.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

282.   Because Stanford's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to 29 U.S.C. § 794a.

283.   Named Plaintiffs and members of the proposed class have no adequate remedy at law and unless the relief requested herein is granted, Named Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied access to Stanford's programs and services. Consequently, Named Plaintiffs and members of the proposed class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C. § 794a(a)(2) & (b).

284.   WHEREFORE, Named Plaintiffs and members of the proposed class request relief as set forth below.

## **THIRD CAUSE OF ACTION**

### **Violation of the Fair Housing Act**

### **42 U.S.C. § 3601, *et seq.***

285.   Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

286.   The Fair Housing Act prohibits discrimination in the terms, conditions, sale, or rental of a dwelling, on the basis of disability. 42 U.S.C. § 3604(f)(1)–(2). *See also* 24 C.F.R. §§ 100.20, 100.60(a), 100.60(b)(2).

287.   As persons with mental health disabilities, Named Plaintiffs and members of the proposed class are protected from discrimination under the Fair Housing Act. 42 U.S.C. § 3602(h). *See also* 24 C.F.R. § 100.201.

288.   Stanford's residence halls are covered "dwellings" under the Fair Housing Act. *See* 42 U.S.C. § 3602(b), (c). *See also* 24 C.F.R. § 100.201.

289.   The Fair Housing Act prohibits discrimination in the form of refusing to make reasonable accommodations in rules, policies, practices, or services, when such may be

1    necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling.

2    42 U.S.C. § 3604(f)(3)(B).

3        290.    Under the Fair Housing Act, it is unlawful to coerce, intimidate, threaten, or

4    interfere with any person in the exercise or enjoyment of any right granted or protected by

5    section 3604 of the Fair Housing Act. 42 U.S.C. § 3617.

6        291.    The Fair Housing Act also prohibits making, publishing or printing any notice or

7    statement with respect to the sale or rental of a housing accommodation that indicates at

8    preference, limitation or discrimination on the basis of disability. 42 U.S.C. § 3604(c).

9        292.    Housing and Urban Development ("HUD") regulations implementing the Fair

10   Housing Act clarify that prohibited actions include using different criteria, standards,

11   requirements, rental procedures, or lease or contract provisions, because of disability. 24 C.F.R.

12   §§ 100.60(b)(4), 100.65(b)(1).

13       293.    Prohibited actions further include limiting the use of a dwelling's privileges,

14   services, or facilities, or evicting tenants because of disability. 24 C.F.R. §§ 100.60(b)(5),

15   100.65(b)(4).

16       294.    Stanford has violated the Fair Housing Act by maintaining and implementing

17   terms and conditions of housing that exclude and otherwise discriminate against Named

18   Plaintiffs and members of the proposed class on the basis of disability.

19       295.    Stanford has further violated the Fair Housing Act by refusing to make reasonable

20   accommodations in rules, policies and services, when such accommodations may be necessary to

21   afford Named Plaintiffs and members of the proposed class equal opportunities to use and enjoy

22   their residence halls.

23       296.    Stanford has also violated the Fair Housing Act by publishing statements,

24   including campus-wide housing policies, that discriminate or indicate a preference or limitation

25   on the basis of disability.

26       297.    Stanford has violated HUD regulations implementing the Fair Housing Act by

27   utilizing criteria, standards, and requirements that discriminate against Named Plaintiffs and

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

members of the proposed class on the basis of disability, including requiring them to submit personal statements and medical documentation in advance of being readmitted to residence halls.

298.    Named Plaintiffs and members of the proposed class have no adequate remedy at law and unless the relief requested herein is granted, Named Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied access to Stanford's programs and services. Consequently, Named Plaintiffs and members of the proposed class are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 42 U.S.C. § 3613(c).

299.    WHEREFORE, Named Plaintiffs and members of the proposed class request relief as set forth below.

## FOURTH CAUSE OF ACTION

### Violation of the Unruh Civil Rights Act

### California Civil Code § 51, *et seq.*

300.    Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

301.    The California Unruh Civil Rights Act ("Unruh Act") provides that all persons in California are free and equal, and no matter their disability, are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. Cal. Civ. Code § 51(b).

302.    As persons with mental health disabilities, Named Plaintiffs and members of the proposed class are persons with disabilities within the meaning of the Unruh Act. Cal. Civ. Code § 51(e)(1). *See also* Cal. Gov. Code §§ 12926(j), 12926.1.

303.    Stanford is a business establishment within the jurisdiction of the state of California, and as such is obligated to comply with the provisions of the Unruh Act. Cal. Civ. Code §51, *et seq.*

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

304. Stanford has violated the Unruh Act by excluding students with mental health disabilities from fully and equally enjoying Stanford's academic, housing, and related services and programs.

305. The Unruh Act also provides, *inter alia*, that a violation of the ADA shall also constitute a violation of the Unruh Act. Cal. Civ. Code § 51(f).

306. Stanford's discriminatory conduct alleged herein includes, *inter alia*, the violation of the rights of persons with disabilities set forth in Title III of the ADA and therefore also violates the Unruh Act.

307. Stanford's actions have violated and continue to violate the Unruh Act and therefore Named Plaintiffs and members of the proposed class are entitled to injunctive relief to remedy the discrimination, as well as reasonable attorneys' fees. Cal. Civ. Code §§ 52, 52.1(b), (h).

308. WHEREFORE, Named Plaintiffs and members of the proposed class request relief as set forth below.

## FIFTH CAUSE OF ACTION

### Violation of California Government Code § 11135

309. Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

310. California Government Code § 11135 ("Section 11135") provides that no person with a disability in the State of California shall, on the basis of disability, "be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity" that receives any financial assistance from the state. Cal. Gov. Code § 11135(a).

311. As persons with mental health disabilities, Named Plaintiffs and members of the proposed class are protected by this code. Cal. Gov. Code § 11135(c). *See also* Cal. Gov. Code §§ 12926(j)(1)–(2).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

312.    As an educational institution which permits students to pay education-related costs with the assistance of California grants, and has done so at all times relevant to the claims asserted in this Complaint, Stanford is a recipient of state financial assistance sufficient to invoke Section 11135 coverage.

313.    Stanford has denied Named Plaintiffs and members of the proposed class full and equal access to the benefits of Stanford's programs and activities, on the basis of disability.

314.    As a proximate result of Stanford's violations of Section 11135, Named Plaintiffs and members of the proposed class have been injured as set forth herein.

315.    Named Plaintiffs and members of the proposed class have no adequate remedy at law. Unless the relief requested herein is granted, Named Plaintiffs and members of the proposed class will suffer irreparable harm in that they will continue to be discriminated against and denied full access to Stanford's facilities, programs, services, and activities on the basis of disability. Consequently, Named Plaintiffs and members of the proposed class are entitled to injunctive relief and reasonable attorneys' fees and costs.

316.    WHEREFORE, Named Plaintiffs and members of the proposed class request relief as set forth below.

### SIXTH CAUSE OF ACTION

**Violation of the California Fair Employment and Housing Act**

**California Government Code § 12900,** *et seq.*

317.    Plaintiffs incorporate by reference the foregoing allegations as if set forth fully herein.

318.    California's Fair Employment and Housing Act ("FEHA") prohibits housing accommodations from discriminating against or harassing individuals on the basis of disability. Cal. Gov. Code § 12955(a).

319.    As individuals with mental health disabilities, Named Plaintiffs and members of the proposed class are covered under this Act. Cal. Gov. Code §§ 12955.3, 12926(j)(1)–(2).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

320.    Stanford's residence halls are housing accommodations covered under this Act. Cal. Gov. Code § 12927(d). Additionally, as a California business establishment subject to the Unruh Civil Rights Act that provides housing accommodations, Stanford is a covered entity under this Act. Cal. Gov. Code § 12955(d).

321.    FEHA prohibits refusing to rent, terminating a rental agreement, or otherwise making unavailable or denying a dwelling based on disability. Cal. Gov. Code §§ 12927(c)(1),12955(k).

322.    FEHA further prohibits housing accommodation owners from making any written or oral inquiry concerning the disability of any person seeking to rent any housing accommodation. Cal. Gov. Code § 12955(b).

323.    FEHA defines discrimination to include harassment or providing inferior terms, conditions, privileges, facilities, or services in connection with housing accommodations. Cal. Gov. Code § 12927(c)(1).

324.    FEHA further defines discrimination to include refusal to make reasonable accommodations in rules, policies, practices, or services when those accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy the dwelling. Cal. Gov. Code § 12927(c)(1).

325.    Additionally, FEHA prohibits making, publishing or printing any notice or statement with respect to the sale or rental of a housing accommodation that indicates at preference, limitation or discrimination on the basis of disability. Cal. Gov. Code § 12955(c).

326.    Stanford has violated FEHA by terminating rental contracts and excluding students with mental health disabilities from its residence halls, on the basis of disability.

327.    Stanford has violated FEHA by requiring students with mental health disabilities to submit medical documentation in advance of allowing them readmission to the residence halls.

328.    Stanford has further violated FEHA by refusing to make reasonable accommodations to policies and procedures to allow students with mental health disabilities to

1   remain in housing or to waive housing cancellation fees when it unilaterally terminates students'

2   housing contracts on the basis of disability.

3   329.   Additionally, Stanford has violated FEHA by publishing statements, including

4   campus-wide housing policies, that discriminate or indicate a preference or limitation on the

5   basis of disability.

6   330.   Named Plaintiffs and members of the proposed class have no adequate remedy at

7   law and unless the relief requested herein is granted, Named Plaintiffs and members of the

8   proposed class will suffer irreparable harm in that they will continue to be discriminated against

9   and denied access to Stanford's programs and services. Consequently, Named Plaintiffs and

10   members of the proposed class are entitled to injunctive relief, as well as reasonable attorneys'

11   fees and costs. Cal. Gov. Code § 12989.2.

12   331.   WHEREFORE, Named Plaintiffs and members of the proposed class request

13   relief as set forth below.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief

16   332.   Plaintiffs incorporate by reference the foregoing allegations as if set forth fully

17   herein.

18   333.   An actual controversy has arisen and now exists between the parties in that

19   Named Plaintiffs and members of the proposed class contend, are informed, and believe that

20   Stanford denies that it is violating Title III of the ADA, Section 504 of the Rehabilitation Act,

21   the Fair Housing Act, and related state laws, by excluding students with mental health disabilities

22   from its programs and services and causing students with mental health disabilities to be deterred

23   from using Stanford services due to fear of being so excluded.

24   334.   A judicial declaration is necessary and appropriate at this time in order that each

25   of the parties may know their respective rights and duties and act accordingly.

26   335.   WHEREFORE, Named Plaintiffs and members of the proposed class request

27   relief as set forth below.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

## REQUEST FOR RELIEF

336.   WHEREFORE, Named Plaintiffs and members of the proposed class request relief as follows:

337.   An order certifying this case as a class action under Fed. R. Civ. P. 23(a); and 23(b)(2) appointing Plaintiffs as class representatives, and their attorneys as class counsel.

338.   A declaration that Stanford's conduct as alleged herein has violated and continues to violate the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws.

339.   An order enjoining Stanford and its employees, agents, and any and all other persons acting on Stanford's control from violating the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws.

340.   A permanent injunction pursuant to the ADA, Section 504 of the Rehabilitation Act, the Fair Housing Act, and related state laws requiring Stanford to modify its policies and procedures to ensure that students with mental health disabilities have nondiscriminatory, full and equal access to academic, housing, health, insurance, and all other facilities, services, and activities provided by Stanford.

341.   Award Plaintiffs' attorneys' fees and costs, as provided by statute.

342.   Such other and further relief as the Court deems just and proper.

DATED: July 16, 2018                         Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

Stuart Seaborn                          Maia Goodell (Admitted *Pro Hac Vice*)
Monica Porter                           Disability Rights Advocates
Disability Rights Advocates             655 Third Avenue, 14th Floor
2001 Center Street, Fourth Floor        New York, New York 10017
Berkeley, California 94704-1204         Telephone: (212) 644-8644
Telephone:    (510) 665-8644            mgoodell@dralegal.org
Facsimile:    (510) 665-8511
sseaborn@dralegal.org                   *Attorneys for Plaintiffs*
mporter@dralegal.org